770 So.2d 1210 (2000)
CHICAGO TITLE INSURANCE CO., et al., Appellants,
v.
S. Clark BUTLER, et al., Appellees.
No. SC95312.
Supreme Court of Florida.
October 19, 2000.
*1211 Davisson F. Dunlap, Jr., and Robert Pass of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, Florida, and Mark A. Brown of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Florida; Michael E. Marder and Stephanie A. Yelenosky of Greenspoon, Marder, Hirschfeld, Rafkin, Ross & Berger, P.A., for Commonwealth Land Title Insurance Company, Orlando, Florida; Zollie M. Maynard and William C. Owen of Panza, Maurer, Maynard & Neel, P.A., Tallahassee, Florida; Douglas A. Mang and Wendy Russell Wiener of the Mang Law Firm, P.A., Tallahassee, Florida; Lee Huszagh, Florida Land Title Association, Tallahassee, Florida; Michael L. Peterson, Florida Association of Independent Title Agents, Inc., Apollo Beach, Florida; William H. Hughes, III and Kevin X. Crowley of Pennington, Moore, Wilkinson, Bell and Dunbar, P.A., Tallahassee, Florida; and George P. Daniels, American Pioneer Title Insurance Company, Casselberry, Florida, for Appellants.
Thomas J. Guilday, Vikki R. Shirley and Roberto M. Vargas of Huey, Guilday & Tucker, P.A., Tallahassee, Florida; Daniel Y. Sumner, General Counsel, and S. Marc Herskovitz, Senior Attorney, Division of Legal Services, Florida Department of Insurance, Tallahassee, Florida; and B. Forest Hamilton and Benjamin K. Phipps of The Phipps Firm, Tallahassee, Florida, for National Title Insurance Company, for Appellees.
John G. Crabtree, Ocala, Florida; and G. Thomas Smith of Smith, Sauer, DeMaria, Pensacola, Florida, for The Real Property, Probate & Trust Law Section of The Florida Bar, Amicus Curiae.
PER CURIAM.
We have for review a trial court order declaring several anti-rebate statutes regarding the premiums to be negotiated between title insurance agents and consumers to be unconstitutional. The district court certified the issue as one involving a question of great public importance, requiring immediate resolution by this Court. We have jurisdiction. Art. V, § 3(b)(5), Fla. Const. For reasons expressed below, we affirm the trial court's order declaring the statutes unconstitutional.

MATERIAL FACTS
S. Clark Butler, a builder and developer, challenges the constitutionality of sections 626.611(11),[1] 626.8437,[2] 626.9541(1)(h)3.a.,[3] *1212 627.780,[4] 627.782[5] and 627.783[6] of the Florida Statutes (1997) and rule 4186.003(13)(a) *1213 of the Florida Administrative Code,[7] which prohibit title insurance agents from negotiating or rebating to their clients any portion of the risk premium charged for the issuance of title insurance. The risk premium, as defined by statute, is the charge by a title insurer for assuming the risk of issuing the title insurance. See § 627.7711, Fla. Stat. (1997).[8] Under the Insurance Code and administrative rules in effect at the time Butler filed suit, for policies sold by agents, title insurers are guaranteed thirty percent of the risk premium and title insurance agents retain the remaining seventy percent. See § 627.782(1). Butler seeks the right to negotiate the agent's share of the risk premium only.
In pursuit of this end, Butler filed a complaint against the Department of Insurance seeking a declaratory judgment that sections 626.572, 626.9541(1)(h)3.a., and 626.611(11), Florida Statutes (1997), and rule 4-186.003(13) were unconstitutional as a violation of his substantive due process rights under article I, section 9 of the Florida Constitution.[9] The Florida Home Builders Association and National Title Insurance Company subsequently intervened as plaintiffs. On the other hand, several title insurance agents and companies intervened as defendants, including Chicago Title Insurance Company, American Pioneer Title Insurance Company, Florida Land Title Association, Attorney's Title Insurance Fund, Inc., Florida Association of Independent Title Insurance Agents, Commonwealth Land Insurance Company, Lawyers Title Insurance Company, and Stewart Title Guaranty Company (hereinafter referred to as "Appellants").
Butler moved for partial summary judgment to establish that section 626.572, Florida Statutes (1997), which permits rebates by insurance agents in certain circumstances, applies to title insurance agents as well. The circuit court denied Butler's motion, finding that section 626.572 does not apply to title insurance agents. Butler then filed a second amended complaint, adding sections 626.8437, 627.780, 627.782 and 627.783 to his constitutional *1214 challenge. Subsequently, all parties moved for summary judgment.
Butler claimed that the statutory and rule provisions prohibiting title insurance agents from negotiating partial rebates of their fees with their customers deprived him of his constitutionally secured property interest in contracting and negotiating a commission paid to title insurance agents. Although the circuit court recognized the defendants' interest in "maintaining a `viable and orderly private sector market for property insurance in this state'" which it felt justified the regulation of rates and rebates in the challenged provisions, the court nonetheless invalidated the anti-rebate statutes under the authority of Department of Insurance v. Dade County Consumer Advocate's Office, 492 So.2d 1032 (Fla.1986), which held that similar statutes prohibiting rebates of commissions paid to insurance agents were unconstitutional. In a separate order, the circuit court clarified that it declared unconstitutional "only those provisions of the statutes that prohibit an agent from rebating any portion of his or her commission" and that by use of the term "commission" the court meant "the agent's share of the risk premium."
The parties on both sides appealed to the First District Court of Appeal.[10] Upon the parties' motion, the district court certified this case as one involving an issue of great public importance requiring immediate resolution by this Court.[11] This appeal follows.

APPEAL
Appellants argue that the trial court erred in declaring the anti-rebate statutes unconstitutional under Dade County because title insurance agents are different from the insurance agents at issue in that case. They contend that title insurance agents are unique in that their responsibilities and quality of performance directly affect the soundness of the policy, the total premium customers pay, and the solvency of the title insurance industry. Butler, on the other hand, argues that the anti-rebate statutes infringe on a citizen's right to bargain or negotiate for insurance rates, thereby violating his substantive due process rights under article I, section 9 of the Florida Constitution.[12]
We begin our analysis with the premise that all laws are presumed constitutional. See Florida Dept. of Educ. v. Glasser, 622 So.2d 944, 946 (Fla.1993); Larson v. Lesser, 106 So.2d 188, 191 (Fla. 1958). The burden rests on the party challenging the law to show that it is invalid. See Village of North Palm Beach v. Mason, 167 So.2d 721, 726 (Fla.1964). The test to be applied in determining whether a statute violates due process is whether *1215 the statute bears a rational relation to a legitimate legislative purpose in safeguarding the public health, safety, or general welfare and is not discriminatory, arbitrary, or oppressive. See Lane v. Chiles, 698 So.2d 260, 263 (Fla.1997); Lite v. Slate, 617 So.2d 1058, 1059 (Fla.1993); Belk-James, Inc. v. Nuzum, 358 So.2d 174, 175 (Fla.1978); Lasky v. State Farm Ins. Co., 296 So.2d 9, 15 (Fla.1974); Stadnik v. Shell's City, Inc., 140 So.2d 871, 874 (Fla.1962).
After considering these well-established principles of law, we conclude, as did the trial court, that this case is virtually indistinguishable from the circumstances and statutes at issue in Department of Insurance v. Dade County Consumer Advocate's Office, 492 So.2d 1032 (Fla.1986), which declared similar statutes to be invalid as an unconstitutional infringement on the public's right to effective bargaining power with those from whom they seek to purchase services.

Dade County Consumer Advocates' Office
In Dade County, the Consumers Advocate's Office (Consumer Advocate) filed a complaint against the Department of Insurance alleging that certain anti-rebate statutes prevented price competition with respect to insurance agents' commissions, thereby depriving consumers of their property without due process in violation of article I, section 9 of the Florida Constitution.[13] The Department of Insurance argued that the anti-rebate statutes guaranteed insurer solvency and prevented discrimination against insureds in the same actuarial class. The Department and various amici further argued that the antirebate statutes advanced the economic protection of Florida consumers by establishing uniform rates; that, in the absence of these laws, similarly situated consumers would pay different prices for the same policy; that consumers' efforts to compare prices would be thwarted; that consumers would focus on the size of the rebate rather than the quality of insurance; that premiums would increase as a result of pressure by agents for larger commissions so as to offer large rebates; and that many policies would lapse because consumers would replace their policies each year with new policies by different agents offering larger rebates, resulting in higher administrative costs. The trial court found the challenged statutes to be a valid exercise of police power and regulatory authority to protect the public from discrimination. The district court reversed, concluding that it was unable to find a legitimate state interest "justifying the continued existence of the anti-rebate statutes." Dade County Consumer Advocate's Office v. Department of Ins., 457 So.2d 495, 497 (Fla. 1st DCA 1984).
On review, this Court affirmed, finding that the anti-rebate statutes at issue unconstitutionally interfered with a citizen's property rights by unnecessarily limiting the bargaining power of the consuming public. See Dade County, 492 So.2d at 1033. In so concluding, this Court looked to case law from this Court and from the United States Supreme Court striking legislation curtailing the economic bargaining power of the public.
We are concerned with the narrow issue of whether a statute that prohibits an insurance agent from reducing the amount of the commission he or she will earn from selling the insurance is valid. Historically, this Court has carefully reviewed laws that curtail the economic bargaining power of the public. In fact, this Court was one of the first to hold unconstitutional a "fair trade act" that allowed a manufacturer to establish a *1216 minimum retail price for which the retailer could sell a product to the consumer. See Liquor Store v. Continental Distilling Corp., 40 So.2d 371 (Fla.1949). We found that such legislation is not within the scope of the state's police power and noted that "[c]onstitutional law never sanctions the granting of sovereign power to one group of citizens to be exercised against another unless the general welfare is served." Id. at 374 (emphasis in original). We concluded that the act was arbitrary, unreasonable, and violated the right to own and enjoy property. In Larson v. Lesser, 106 So.2d 188 (Fla.1958), we struck down as unconstitutional a statute that prohibited a public adjuster who represents insureds from soliciting business on the ground that the restraint imposed was not rationally related to the public's welfare. In Stadnik v. Shell's City, Inc., 140 So.2d 871 (Fla.1962), this Court held invalid a pharmacy board rule that prohibited the advertisement of the name or price of prescription drugs on the basis that it was an attempt to prohibit price competition which had no reasonable relation to public safety, health, morals or general welfare. In Florida Board of Pharmacy v. Webb's City, Inc., 219 So.2d 681 (Fla.1969), we held invalid a statute which prohibited retail drug establishments from using the media to promote the use or sale of prescription drugs.
In recent years, the United States Supreme Court also has struck down governmental statutes or regulations that restrict the competitive pricing of consumer services. While recognizing that states have broad power to establish standards for licensing practitioners and regulating the practice of professions within their boundaries, the Court, in Goldfarb v. Virginia State Bar, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), determined that a minimum fee schedule for attorneys enforced through the prospect of professional discipline by the state bar association and the state supreme court violated the Sherman Anti-Trust Act. In Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), the Court held unconstitutional, on first and fourteenth amendment grounds, that part of a statute declaring it unprofessional for a pharmacist to advertise prices for prescription drugs. In Bates v. State Bar of Arizona, 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), the Court held that a disciplinary rule prohibiting attorneys from advertising the cost of their services violated the first amendment.
Dade County, 492 So.2d at 1034. We next considered whether the anti-rebate statutes were rationally related to the State's interest in promoting the public's health, safety and welfare. In concluding that they were not, we reasoned:
From our review of the record, we find no identifiable relationship between the anti-rebate statutes and a legitimate state purpose in safeguarding the public health, safety or general welfare. Insurance agents' commissions do not affect the net insurance premium and are unrelated to the actuarial soundness of insurance policies. The other arguments presented by the Department of Insurance in support of the statutes' constitutionality have been properly responded to by the district court in its opinion. Many of these arguments have been previously unsuccessfully made to uphold statutes or regulations limiting consumers' bargaining power for other services.
Id. at 1035.[14] Appellants contend that the reasoning of Dade County does not apply *1217 to the statutes at issue herein because the underwriting services provided by title insurance agents directly affect the solvency of the title insurers and the soundness of the title insurance policy.
Appellants argue that unlike general insurance agents, title insurance agents are primarily responsible for researching, detecting, and eliminating any defects in title that would affect the title insurance ultimately issued. Because the services provided by the title agent directly affect the risk of liability to the title insurer, the functions of the title insurance agent are essential to the maintenance of solvency and soundness of the title insurer and, therefore, are directly related to the public interest. Appellants argue that such relationship was lacking in Dade County and hence was the reason for the anti-rebate statutes being held unconstitutional in that case.[15]
We find appellants' arguments to be unpersuasive. First, it is unclear that the fact the title insurance agents play a greater role in effectuating policies has any bearing on the industry's solvency. We note that the Legislature expressly attempted to reduce the risk of insurer insolvency in its 1992 amendments to the insurance code. During the 1992 legislation, the Legislature rewrote several provisions of the Insurance Code to address growing concerns within the title insurance industry, one of which was insurer solvency. As noted by the parties to this appeal, a group of title insurers and agents commissioned a study on the current situation concerning the title insurance industry in Florida. See 1992 Final Bill Analysis, supra at 33. The study found that in the late 1980s, title insurers lost money each year by providing title information to title insurance *1218 agents at an amount below the cost to prepare such documents. See id. at 34. Similarly, title insurance agents suffered a loss each year due to closing costs. The study found that "the costs to an agent in a closing exceed the commission the agent will receive on the risk premium." Id. However, competitive pressures often prevent title insurance agents from charging additional fees for closings, resulting in agents' performing closings at a loss. See id. Apparently, both title insurers and title insurance agents were forced to operate at a loss due to the highly competitive nature of the industry.
In an effort to alleviate these problems, the Legislature divided the total premium for title insurance policies into two components: (1) related title services, which covered closing costs and (2) risk premium, which was an amount intended to cover the risk assumed by the title insurer. See §§ 627.7711, .782, Fla. Stat. (Supp.1992). Under the newly structured law, the title insurer must receive no less than thirty percent of the risk premium. See id. § 627.782(1). This means, therefore, that title insurance agents, on the other hand, would be entitled to the remaining seventy percent of the risk premium. Title agents could also collect a fee for related title services, as long as the fee for such services did not fall below the cost for providing such services. See id. § 627.7711(1); Fla. Admin. Code r. 4-186.003(13)(a) ("At least actual cost must be charged for related title services in addition to the adopted risk premium.").[16]
Nowhere in the legislative history to the 1992 amendments, however, does the Legislature discuss the anti-rebating provisions as a further means of ensuring the solvency of the title insurance industry. Indeed, the legislative history to the 1992 amendments does not address the rebate statutes other than to note their continued existence. However, since the Legislature has guaranteed thirty percent of the risk premium to title insurers for the sole purpose of ensuring industry solvency, appellants' argument that a rebate of the agent's share of the risk premium would adversely impact the insurer's solvency appears unavailing.[17]
We also reject appellants' second ground for distinguishing Dade County on the basis of the relationship between the title agent's performance and the resulting soundness of the insurance policy. Appellants contend that if title agents are allowed to negotiate the amount of premium they collect, they will be forced to cut corners in order to remain competitive with other title agents, thereby jeopardizing the quality and level of skill necessary to perform the underwriting services. However, a similar quality-of-service-based argument was rejected by the First District Court of Appeal in Dade County Consumer Advocate's Office v. Department of Insurance, 457 So.2d 495 (Fla. 1st DCA 1984), aff'd, 492 So.2d 1032 (Fla.1986), wherein it stated:
Perhaps the department's and amicis' strongest argument is that the agent who is permitted to rebate will do so at the expense of his customers, in that they will not be provided with the quality of information regarding the best type of insurance suited to their needs because the agent, having negotiated his commission, will not spend the requisite time counseling his clients. Accordingly, the argument goes, the public must *1219 be protected from low-cost, low-quality service, and the statutes banning rebating therefore advance a legitimate public interest. We recognize that this argument is not without merit but we are not convinced that it validates the exercise of the police powers of the state. Indeed, the Supreme Court was faced with a similar argument in Virginia Pharmacy Board v. Virginia [Citizens] Consumer Council, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976), in support of a Virginia statute prohibiting druggists from advertising the prices of their drugs, which had urged the public needed to be protected from the evils of advertising because the low-cost, lowquality pharmacist would attract too many unwitting customers and thereby drive the professional druggist out of business, resulting in the destruction of the traditional pharmacist-customer relationship. The Court, however, rejected the argument, stating:
There is, of course, an alternative to this highly paternalistic approach. That alternative is to assume that this information is not in itself harmful, that people will perceive their own best interests if only they are well enough informed, and that the best means to that end is to open the channels of communication rather than to close them. If they are truly open, nothing prevents the "professional" pharmacist from marketing his own assertedly superior product, and contrasting it with that of the low-cost, high-volume prescription drug retailer. But the choice among these alternative approaches is not ours to make or the Virginia General Assembly's. It is precisely this kind of choice, between the dangers of suppressing information, and the dangers of its misuse if it is freely available, that the First Amendment makes for us. Virginia is free to require whatever professional standards it wishes of its pharmacists; it may subsidize them or protect them from competition in other ways. Cf. Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). But it may not do so by keeping the public in ignorance of the entirely lawful terms that competing pharmacists are offering. In this sense, the justifications Virginia has offered for suppressing the flow of prescription drug price information, far from persuading us that the flow is not protected by the First Amendment, have reinforced our view that it is.
425 U.S. at 770, 96 S.Ct. at 1829.
Similarly, we believe that the choice opted for by the Florida legislature does not come within the confines of the due process clause. The dangers of the misuse of information to the consumer by the unscrupulous or indifferent agent may exist, but the possibilities of such abuse cannot serve to suppress bargaining or information which might otherwise lead to an informed choice. Indeed, competitive forces at work in the marketplace should generally serve to protect consumers against unfairly discriminatory prices, provided that there is adequate disclosure available to make consumers aware of alternative sources and prices of insurance.
Dade County Consumer Advocate's Office, 457 So.2d at 497-98 (footnote omitted).
The same reasoning utilized by the First District would appear to apply here. Obviously, the quality of title agents' underwriting is a valid concern of the Legislature, which justifies the enactment of means of regulating the agents' performance for the betterment of the industry. However, the Legislature may not impose quality control regulations in a manner that harms the public and violates a citizen's property rights to freely negotiate the cost of services from a provider. While the possibility exists that some agents may sacrifice the level of care they place in underwriting title insurance policies, the regulatory laws intended to curb *1220 such practices should not outweigh the public's right to effective bargaining power. We note, for example, that attorneys who perform title services appear to be expressly exempted from the anti-rebate provisions in section 626.9541 with regard to legal fees, see, e.g., § 626.9541(1)(h)3.a. (providing that "nothing herein contained shall preclude an abatement in an attorney's fee charged for services rendered incident to the issuance of [title] insurance"), and from the licensing and appointment requirements in chapter 626 relating to title insurance agents, see, e.g., § 626.8417(4)(a), Fla. Stat. (1997) ("Title insurers or attorneys duly admitted to practice law in this state ... are exempt from the provisions of this chapter with regard to title insurance licensing and appointment requirements.").
In this case, we also fail to see how a competitive pricing structure for obtaining title insurance would negatively affect the soundness of the resulting policy. As noted above, the net premium is divided into two components: related title services, which covers closing costs, and the risk premium, which covers the risk assumed by the title insurer. The right to negotiate for a voluntary rebate sought by Butler would only come from the agent's share of the risk premium and would not affect the portion of the premium guaranteed to the insurer or the cost for related title services. According to the rule set by the Department of Insurance, the related title services are charged separately and cannot be reduced to an amount below the cost of performing such services. See Fla. Admin. Code r. 4-186.003(13)(a). Thus, under the statutory scheme title agents will be compensated for the services they provide and will not be forced to compromise the quality of their work if rebates from the "risk premium" are offered to the consuming public.
More importantly, appellants do not explain how a blanket prohibition against title insurance agents' negotiating their portion of the risk premium with their customers promotes a public interest. Rather, even appellant's arguments in support of the anti-rebate statutes are geared more toward maintaining a sound private market for title insurers than with benefitting the public at large. As in Dade County, we must be concerned with whether the challenged statutes are related to a public purpose.
After considering the arguments presented by both parties in this case, and as we did in Dade County, we find that the anti-rebate statutes do infringe upon a citizen's property rights and unconstitutionally restrict a citizen's rights to freely bargain for services. To uphold such regulatory laws, there must be some reasonable relationship to a public benefit. See Dade County. While we acknowledge the Legislature's interest in protecting title insurers and agents against insolvency, such purpose is not furthered by the antirebate statutes presented herein. As noted throughout this opinion, the Legislature has taken great strides in protecting the industry's solvency and the soundness of the insurance policies through means other than the anti-rebate statutes. One such means is the statutory mandate that title insurers receive thirty percent of the risk premium to ensure continued solvency. The anti-rebate statutes, on the other hand, do not achieve the Legislature's avowed purposes and instead simply deprive the consuming public of a choice in the price of products or services, the choice of which is the cornerstone of a competitive, free-market economy.
Indeed, it is the consumer's economic liberty that concerned this Court in Dade County. Other than pointing to differences in job performance, appellants have failed to demonstrate how the anti-rebate statutes at issue in this case differ materially to the anti-rebate statutes at issue in Dade County with regard to such statutes' impact on the economic bargaining power of the public. Accordingly, we are unable to distinguish Dade County from the circumstances presented in this case. For *1221 these reasons, we declare the anti-rebate statutes, as they relate to a title agent's ability to negotiate a portion of his or her share of the risk premium, to be unconstitutional.

CONCLUSION
In sum, we hold that the decision in Dade County applies to the statutes at issue in this case,[18] and in accordance with Dade County, we hold that sections 626.611(11), 626.8437, 626.9541(1)(h)3.a., 627.780, 627.782 and 627.783 of the Florida Statutes and rule 4-186.003(13)(a) of the Florida Administrative Code, to the extent they prohibit title insurance agents from rebating a portion of their risk premium, are unconstitutional under article I, section 9 of the Florida Constitution. The trial court's order declaring such statutes unconstitutional is hereby affirmed.
It is so ordered.
WELLS, C.J., and HARDING, ANSTEAD, PARIENTE and QUINCE, JJ., concur.
SHAW, J., dissents.
LEWIS, J., recused.
NOTES
[1] The provisions in chapter 626, Florida Statutes, relate to the licensing procedures and general requirements for insurance agents. Section 626.611(11) gives the Department of Insurance the authority to

deny an application for, suspend, revoke, or refuse to renew or continue the license or appointment of any applicant, agent, title agency ... and it shall suspend or revoke the eligibility to hold a license or appointment of any such person, if it finds that as to the applicant, licensee, or appointee any one or more of the following applicable grounds exist:
. . . .
(11) Unlawfully rebating, attempting to unlawfully rebate, or unlawfully dividing or offering to divide his or her commission with another.
§ 626.611(11), Fla. Stat. (1997).
[2] Section 626.8437, Florida Statutes (1997), contains the same provisions as section 626.611, but refers specifically to title insurance agents. See id. § 626.8437(8) (prohibiting the "[u]nlawful rebating, or attempting to unlawfully rebate, or unlawfully dividing, or offering to unlawfully divide, title insurance premiums, fees, or charges with another, as prohibited by s. 626.9541(1)(h)3.").
[3] Section 626.9541(1)(h)3.a., Florida Statutes (1997), proscribes rebating by title agents or insurers as an unfair method of competition. Section 626.941(1)(h)3.a. states:

No title insurer, or any member, employee, attorney, agent, or solicitor thereof, shall pay, allow, or give, or offer to pay, allow, or give, directly or indirectly, as inducement to title insurance, or after such insurance has been effected, any unlawful rebate or abatement of the charge made incident to the issuance of such insurance, any special favor or advantage, or any monetary consideration or inducement whatever. The words "charge made incident to the issuance of such insurance" shall be construed to encompass underwriting premium, agent's commission, abstracting charges, title examination fee, and closing charges; however, nothing herein contained shall preclude an abatement in an attorney's fee charged for services rendered incident to the issuance of such insurance.
Id. § 626.9541(1)(h)3.a.
[4] The provisions in chapter 627, Florida Statutes, relate to insurance rates and contracts. Under section 627.780, Florida Statutes (1997), no person may "knowingly quote, charge, accept, collect, or receive a risk premium for title insurance other than the risk premium adopted by the department." Id. § 627.780(1).
[5] Section 627.782, Florida Statutes (1997), relating to the adoption of rates, states:

(1) Subject to the rating provisions of this code, the department must adopt a rule specifying the risk premium to be charged in this state by insurers for the respective types of title insurance contracts and services incident thereto. The department may, by rule, establish limitations on such reasonable charges made in addition to the risk premium based upon the expenses associated with the services rendered and other relevant factors. The department must also adopt rules incident to the applicability of the risk premium, including the percentage or amount of the risk premium required to be maintained by the title insurer, and related rules to ensure that the amounts required to be maintained by the insurer are not less than 30 percent of the risk premium for policies sold by agents.
(2) In adopting premium rates, the department must give due consideration to the following:
(a) The insurers' loss experience and prospective loss experience under insured closing service letters, search and examination services, and policy liabilities.
(b) A reasonable margin for underwriting profit and contingencies, including contingent liability under s. 627.7865, sufficient to allow insurers and agents to earn a rate of return on their capital that will attract and retain adequate capital investment in the title insurance business.
(c) Past expenses and prospective expenses for administration and handling of risks.
(d) Liability for defalcation.
(e) Other relevant factors.
(3) Rates may be grouped by classification or schedule and may differ as to class of risk assumed.
(4) Rates may not be excessive, inadequate, or unfairly discriminatory.
(5) The risk premium applies to each $100 of insurance issued to an insured.
(6) The risk premium rates apply throughout this state.
(7) The department shall, in accordance with the standards provided in subsection (2), review the risk premium and the related title services rate as needed, but not less frequently than once every 3 years, and shall, based upon the review required by this subsection, revise the risk premium and the related title services rate if the results of the review so warrant.
(8) The department may, by rule, require licensees under this part to annually submit statistical information, including loss and expense data, as the department determines to be necessary to analyze risk premium and related title services rates, retention rates, and the condition of the title insurance industry.
Id. § 627.782.
[6] Section 627.783, Florida Statutes (1997), permits title insurers to petition the department for an order authorizing a deviation from the adopted risk premium:

(1) A title insurer may petition the department for an order authorizing a specific deviation from the adopted risk premium, and a title insurer or title insurance agent may petition the department for an order authorizing and permitting a specific deviation above the reasonable charge for other services rendered specified in s. 627.782(1). The petition shall be in writing and sworn to and shall set forth allegations of fact upon which the petitioner will rely, including the petitioner's reasons for requesting the deviation. Any authorized title insurer or agent may join in the petition for like authority to deviate or may file a separate petition praying for like authority or opposing the deviation. The department shall rule on all such petitions simultaneously.
(2) If, in the judgment of the department, the requested deviation is not justified, the department may enter an order denying the petition. An order granting a petition constitutes an amendment to the adopted risk premium, and is subject to s. 627.782.
Id. § 627.783.
[7] Rule 4-186.003 of the Florida Administrative Code establishes the amount of risk rate premiums title insurers may charge based on the type and amount of insurance obtained. The rule states in pertinent part:

(13) Unlawful Rebates or Abatement of Charges.
(a) No title insurer, title insurance agent or agency, including attorney agent, shall decrease the risk premium by an illegal rebate or abatement of charges for abstracting, examinations, or closing charges. At least actual cost must be charged for related title services in addition to the adopted risk premium.
See Fla. Admin. Code r. 4-186.003(13).
[8] During the 1999 legislative session, the Legislature amended several portions of the insurance code. See ch. 99-286, Laws of Fla. (1999) (effective July 1, 1999). One such amendment altered the definition of the "risk premium." The word "risk" was deleted and the phrase "primary title services" was added. "Primary title services" is defined as

determining insurability in accordance with sound underwriting practices based upon evaluation of a reasonable search and examination of the title, determination and clearance of underwriting objections and requirements to eliminate risk, preparation and issuance of a title insurance commitment setting forth the requirements to insure, and preparation and issuance of the policy.
See id. § 6 (amending section 627.7711(1), Florida Statutes (1997)).
[9] Butler's complaint was initially dismissed because he had not exhausted all available administrative remedies. The First District Court of Appeal reversed the trial court's dismissal order because Butler's claim was limited to a constitutional challenge to the facial validity of a statute and therefore, the court held, he did not have to exhaust administrative remedies before filing suit in circuit court. See Butler v. State Dept. of Ins., 680 So.2d 1103 (Fla. 1st DCA 1996).
[10] The Department of Insurance did not file a notice of appeal. Butler, Florida Home Builders Association, and National Title Insurance Company (collectively referred to as "Appellees") filed a cross-appeal challenging the trial court's order finding section 626.572 inapplicable to title insurance agents. However, the appellees dismissed the cross-appeal due to the 1999 legislative enactments expressly declaring section 626.572 inapplicable to title insurance agents. See ch. 99-286, § 4.
[11] As mentioned in note 8, supra, the Legislature passed a bill amending several of the statutory provisions at issue in this case. See ch. 99-286, Laws of Florida (1999). In response to the newly enacted law, appellants moved to vacate jurisdiction in this Court and remand this case to the trial court on the ground that the issues herein have been rendered moot by the legislative amendments. By order dated July 14, 1999, this Court denied the motion. Although the legislative amendments occurred subsequent to this Court accepting jurisdiction, most of the recent legislative amendments do not substantively alter the statutory provisions declared invalid by the trial court. The only significant changes appear to be to the definition of "premium," see note 8, supra, and to the preamble of the enacting law, neither of which affect our decision today. Accordingly, we do not believe that the issue before us has been rendered moot by the recent legislative enactment.
[12] That provision states: "No person shall be deprived of life, liberty or property without due process of law ..." Art. I, § 9, Fla. Const.
[13] Specifically, the Consumer Advocate challenged the validity of section 626.611(11) and section 626.9541(1)(h)1, Florida Statutes (1983). Section 626.611(11) is the same statute challenged by Butler and states that the department may take disciplinary action against any agent who rebates or divides his or her commission with another. Section 626.9541(1)(h)1. classifies the giving or offering of rebates as an unfair method of competition.
[14] As a result of this Court's holding in Dade County, the Legislature enacted section 626.572 which permits rebating by insurance agents if certain conditions are satisfied. Section 626.572 states:

(1) No agent shall rebate any portion of his or her commission except as follows:
(a) The rebate shall be available to all insureds in the same actuarial class.
(b) The rebate shall be in accordance with a rebating schedule filed by the agent with the insurer issuing the policy to which the rebate applies.
(c) The rebating schedule shall be uniformly applied in that all insureds who purchase the same policy through the agent for the same amount of insurance receive the same percentage rebate.
(d) Rebates shall not be given to an insured with respect to a policy purchased from an insurer that prohibits its agents from rebating commissions.
(e) The rebate schedule is prominently displayed in public view in the agent's place of doing business and a copy is available to insureds on request at no charge.
(f) The age, sex, place of residence, race, nationality, ethnic origin, marital status, or occupation of the insured or location of the risk is not utilized in determining the percentage of the rebate or whether a rebate is available.
(2) The agent shall maintain a copy of all rebate schedules for the most recent 5 years and their effective dates.
(3) No rebate shall be withheld or limited in amount based on factors which are unfairly discriminatory.
(4) No rebate shall be given which is not reflected on the rebate schedule.
(5) No rebate shall be refused or granted based upon the purchase or failure of the insured or applicant to purchase collateral business.
§ 626.572, Fla. Stat. (1997). The trial court in the instant case ruled that this provision does not apply to title insurance agents. Although Butler initially challenged this ruling on appeal to the district court, the appeal was subsequently dropped in light of the 1999 legislative amendments specifically declaring that section 626.572 does not apply to title insurance agents.
[15] In support of its argument, appellants point to a statement in a 1992 Final Bill Analysis and Economic Impact Statement, wherein the Legislature apparently recognized that "the functions of a title insurance agent are considerably broader than the functions of other insurance agents. Title agents perform underwriting functions that are, with respect to other kinds of insurance, usually performed by insurer employees at the insurer's home office." Fla. H.R. Comm. on Ins., SB 170-H (1992) Bill Analysis and Economic Impact Statement 9 (final July 8, 1992) [hereinafter 1992 Final Bill Analysis]. However, this statement was made in reference to the legislative decision to impose licensing requirements on title agents and title agencies. In other words, one of the purposes behind the 1992 amendments to the Insurance Code was to subject title agents and title agencies to the same requirements as other insurance agents concerning licensing, discipline, appointment, and continuing education.
[16] The 1999 legislative amendments do not alter this 30-70 division of premium except in transactions subject to the Real Estate Procedures Act of 1974 (RESPA), 12 U.S.C. § 2601. In those circumstances, the title agent is not permitted to retain any portion of the premium attributable to primary title services if he or she did not actually perform such services. See Fla. H.R. Comm. on Ins., CS for HB 403 (1999) Staff Analysis 10-11 (final June 29, 1999) (on file with comm.).
[17] We further note that the Legislature has taken additional steps to ensure insurer solvency by requiring title insurers to maintain an adequate premium reserve or guaranty fund. See § 625.111, Fla. Stat. (1997), amended by ch. 99-286, § 2, Laws of Fla.
[18] In so holding, we decline to overrule Dade County as requested by appellants.