870 So.2d 774 (2004)
John M. HAIRE, et al., Petitioners,
v.
FLORIDA DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, Respondent.
Brooks Tropical, Inc., Petitioner,
v.
Florida Department of Agriculture and Consumer Services, Respondent.
Nos. SC03-446, SC03-552.
Supreme Court of Florida.
February 12, 2004.
Rehearing Denied April 6, 2004.
*777 Edward A. Dion, Broward County Attorney, and Andrew J. Meyers, Chief Appellate Counsel, Fort Lauderdale, FL; Robert A. Ginsburg, Miami-Dade County Attorney, and Robert A. Duvall, III, Assistant County Attorney, Miami, FL; Samuel S. Goren, City Attorney, City of Coral Springs, and Michael D. Cirullo of Goren, Cherof, Doody & Ezrol, P.A., Fort Lauderdale, FL; Monroe D. Kiar, Town Attorney, Town of Davie, Davie, FL; Diana Grub Frieser, City Attorney, and John O. McKirchy, Assistant City Attorney, Boca Raton, FL; and Gordon B. Linn, City Attorney, and Jim Stokes, Assistant City Attorney, City of Pompano Beach, Pompano Beach, FL, on behalf of John M. Haire, et al.; and Craig P. Kalil of Aballi, Milne, Kalil & Escagedo, P.A., Miami, FL; William J. Moore, III of Henrichsen Siegel Moore, Jacksonville, FL; and Malcolm A. Misuraca of the Law Offices of Malcolm A. Misuraca, Newport Beach, CA, on behalf of Brooks Tropicals, Inc., for Petitioners.
Arthur J. England, Jr., Elliot H. Scherker, and Elliot B. Kula of Greenberg Traurig, P.A., Miami, FL; Jerold I. Budney of Greenberg Traurig, P.A., Fort Lauderdale, FL; and David C. Ashburn of Greenberg Traurig, P.A., Tallahassee, FL, on behalf of Florida Department of Agriculture and Consumer Services, for Respondent.
Michael L. Rosen of Shook, Hardy & Bacon, L.L.P., Tampa, FL, for Florida Citrus Mutual, Amicus Curiae.
PARIENTE, J.
The primary issue in this case is whether the State, through the Department of Agriculture and Consumer Services (Department), is acting within permissible constitutional boundaries by destroying privately owned citrus trees that are within 1900 feet of a tree infected with citrus canker, even though the destroyed trees show no outward signs of infection and appear healthy. To resolve this issue, we must address the constitutionality of section 581.184, Florida Statutes (2003) (Citrus Canker Law), which contains the statutory authority for the Department to destroy privately owned citrus trees under its Citrus Canker Eradication Program.[1] For the reasons expressed in this opinion, we hold that the Citrus Canker Law is constitutional.
The Fourth District Court of Appeal expressly declared the Citrus Canker Law constitutional, concluding that the statute did not deny either substantive or procedural due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Florida Constitution. See Fla. Dep't of Agric. & Consumer Servs. v. Haire, 836 So.2d 1040, 1060 (Fla. 4th DCA 2003). The Fourth District further concluded that section 933.07(2), Florida Statutes (2003), which authorizes county-wide search warrants, was unconstitutional under the Fourth Amendment to the United States Constitution and article 1, section 12 of the Florida Constitution. See 836 So.2d at 1060. However, the Fourth District determined that there was no Fourth Amendment violation in the inclusion of multiple properties in a single affidavit and search warrant, and in the magistrate's use of an electronic signature. See id.
Although the State does not appeal the determination that section 933.07(2) is unconstitutional, the petitioners, who own citrus trees that have been destroyed or are targeted for destruction, contend that the *778 Citrus Canker Law is unconstitutional because it allows for the destruction of private property without full and just compensation and fails to provide a meaningful opportunity to be heard prior to removal of the citrus trees. The petitioners also challenge the Fourth District's holding that it is permissible under the Fourth Amendment for a magistrate to issue a single search warrant for multiple properties and use an electronic signature.

I. CITRUS CANKER: HISTORY TO DATE
Citrus canker is a disease that is caused by citrus canker bacteria, which attack the fruits, leaves and stems of citrus plants. The bacteria are spread from tree to tree primarily by wind-driven rain or the contamination of equipment or plant material. Although the fruit of an infected tree remains edible, the disease causes defoliation, fruit drop and loss of yield, as well as blemishes on the fruit and a loss of quality. In severe cases, citrus canker can cause girdling of the stems and death of the tree.
Efforts to eradicate citrus canker date from its discovery in 1914:
Citrus canker was discovered in Florida in 1914 and eradication programs continued through the mid 1930s. In the mid 1980s, an Asian strain of citrus canker, xanthomonas axonopodis pv.citri., the strain of citrus canker at issue in this case, was discovered in Manatee County. It was considered eradicated in 1992 and the eradication program halted in 1994. However, in 1995 an outbreak was discovered around the Miami International Airport.
. . . .
Stem lesions can survive for many years and are capable of producing bacterial inoculum eight to ten years later. Although symptoms of citrus canker may be seen seven to fourteen days after infection, the maximum visualization does not occur until approximately 107 to 108 days after infection. This makes it difficult to control a disease which easily spreads through wind-driven rain or contamination of equipment or plant material.
Haire, 836 So.2d at 1043 (quoting Fla. Dep't of Agric. & Consumer Servs. v. City of Pompano Beach, 792 So.2d 539, 541-42 (Fla. 4th DCA 2001)). The Department has assessed the effect of citrus canker on Florida's citrus industry, concluding that
citrus canker would have an immediate impact on the fresh citrus industry which comprises twenty-five percent of the commercial citrus industry, amounting to two billion dollars in losses if not eradicated. If it continues to spread, a federal quarantine could be placed on the state. The quarantine would effectively shut down the distribution of fresh citrus products to other states or internationally.
Id. at 1044 (quoting City of Pompano Beach, 792 So.2d at 542).
For a period of time, the Citrus Canker Eradication Program called for destruction of citrus trees within a 125-foot radius of an infected tree. As explained by the Fourth District in its decision below, the Department later determined that this distance was not effective at stopping the spread of citrus canker:
The 125 foot radius was adopted in the 1980s as a result of a study conducted in Argentina. However, that study did not take into account what would happen in an urban setting.
In Miami-Dade County, the destruction of citrus trees within a 125 foot radius of an infected tree was not reducing the occurrences of citrus canker. Therefore, the Department decided to *779 initiate a study ["the Gottwald study"][[2]] that would measure the distances that citrus canker, Asian strain, would spread in South Florida.
The [Gottwald] study kept track of over 19,000 trees in four sites and determined the distance between the diseased trees and the newly infected trees. The study showed that the eradication program which used the 125 foot radius was inadequate because it only captured about thirty to forty-one percent of infection that spread from a diseased tree.
The results of the [Gottwald] study were presented at a meeting in Orlando attended by approximately twenty individuals and scientists. Those at the meeting examined the findings. After considering a range of distances between diseased trees and newly infected trees at the various sites, those present determined that in order to destroy ninety-five percent of newly infected trees, it was necessary to destroy trees within a 1900 foot radius of a diseased tree, thereby creating a buffer zone which would prevent citrus canker from spreading any further.
In March 1999, the Citrus Canker Technical Advisory Task Force, a body of regulatory individuals, scientists and citrus industry representatives who deal with the issue of citrus canker, unanimously recommended that the Department adopt a policy to destroy trees within a 1900 foot radius of a diseased tree in order to eradicate citrus canker.
Id. (quoting City of Pompano Beach, 792 So.2d at 542) (alterations in original) (footnote added). The Department adopted the Task Force's recommendation, which was soon the subject of a legal challenge. The procedural history of the challenge to the administrative rule is set forth in the Fourth District's opinion. See id. at 1044-45. However, it is the constitutionality of the subsequently passed statute, which also adopted the 1900-foot radius, which is the focus of this case.

II. CITRUS CANKER LAW
During the 2002 legislative session, section 581.184 was amended to require the Department to remove and destroy all citrus trees infected with the citrus canker bacteria and all citrus trees "exposed to infection." See ch.2002-11, § 1, Laws of Fla. (codified at § 581.184(2), Fla. Stat. (2003)). The Legislature defined "infected" trees as those "harboring the citrus canker bacteria and exhibiting visible symptoms of the disease." § 581.184(1)(a), Fla. Stat. (2003). Citrus trees that are "[e]xposed to infection" are those "located within 1,900 feet of an infected tree." § 581.184(1)(b).[3]
In order to carry out the destruction of infected and exposed trees the Department is authorized to provide notice to property owners of the removal of such trees by immediate final order (IFO). See § 581.184(2)(a). The IFO serves as notice to the property owner that the subject citrus trees will be removed and destroyed unless the property owner requests and *780 obtains a stay from the appropriate district court of appeal no later than ten days after delivery of the IFO. See id.
With respect to compensation, section 581.1845, Florida Statutes (2003), titled "Citrus canker eradication; compensation to homeowners whose trees have been removed," provides in pertinent part:
(1) The Department of Agriculture and Consumer Services shall provide compensation to eligible homeowners whose citrus trees have been removed under a citrus canker eradication program. Funds to pay this compensation may be derived from both state and federal matching sources and shall be specifically appropriated by law. Eligible homeowners shall be compensated subject to the availability of appropriated funds.
. . . .
(3) The amount of compensation for each tree removed from residential property by the citrus canker eradication program shall be $100 per tree. If the homeowner's property is eligible for a Shade Dade or a Shade Florida Card, the homeowner may not receive compensation under this section for the first citrus tree removed from the property as part of a citrus canker eradication program.
(4) The specification of a per-tree amount paid for the residential citrus canker compensation program does not limit the amount of any other compensation that may be paid by another entity or pursuant to court order for the removal of citrus trees as part of a citrus canker eradication program.

. . . .
(6) For the 2003-2004 fiscal year only, and notwithstanding the $100-compensation amount specified in subsection (3), the amount of compensation for each tree removed from residential property by the citrus canker eradication program shall be $55. This subsection expires July 1, 2004.
(Emphasis supplied.)
Section 581.1845 thus specifies that eligible homeowners receive $100 or $55 for each destroyed tree, depending on when the trees were destroyed, see § 581.1845(3), (6), and "subject to the availability of appropriated funds." § 581.1845(1). However, if "the homeowner's property is eligible for a Shade Dade or a Shade Florida Card,[4] the homeowner may not receive compensation ... for the first citrus tree removed from the property" as part of the eradication program. See § 581.1845(3) (emphasis supplied). Lastly, subsection (4) of section 581.1845 states that the per-tree amount paid under this compensation program "does not limit the amount of any other compensation that may be paid by another entity or pursuant to court order." § 581.1845(4) (emphasis supplied).
The petitioners argue that the Fourth District erred in concluding that the Citrus Canker Law does not deny either substantive or procedural due process. We address each of these issues separately below.

A. Substantive Due Process
In both the Federal and Florida Constitutions there are two separate constitutional provisions that protect an individual's *781 property rightsthose provisions that prohibit the taking of private property for public use without just compensation, see U.S. Const. amend. V; art. X, § 6, Fla. Const,[5] and those provisions that prohibit the deprivation of life, liberty or property without due process of law. See U.S. Const. amends. V, XIV, § 1; art. I, § 9, Fla. Const.[6] A citizen's right to "due process of law" encompasses both procedural and substantive due process. See State v. O.C., 748 So.2d 945, 948 n. 3 (Fla.1999). Substantive due process protects "the full panoply of individual rights from unwarranted encroachment by the government." Dep't of Law Enforcement v. Real Property, 588 So.2d 957, 960 (Fla.1991).
The due process clauses involve what is commonly referred to as the State's "police power," while the compensation clauses concern the State's power of eminent domain. See Tampa-Hillsborough County Expressway Auth. v. A.G.W.S. Corp., 640 So.2d 54, 57 (Fla. 1994). In Joint Ventures, Inc. v. Department of Transportation, 563 So.2d 622 (Fla.1990), we explained the difference between eminent domain and the police power:
Under the power of eminent domain, the state has the inherent right to take private property for public use without the consent of the owner. Shavers v. Duval County, 73 So.2d 684, 688 (Fla. 1954). In so doing, the state is obliged to make full compensation. Indeed, the Florida Legislature has implemented a complete statutory scheme in chapters 73 and 74, Florida Statutes (1987), to assure the payment of such compensation.
However, as Justice Holmes recognized, the "seemingly absolute protection" of required compensation is "qualified" by another inherent power of the state, the police power. Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). Although both powers impact on private property, there is a distinction between the power of eminent domain and the police power:

[T]he former involves the taking of property because of its need for the public use while the latter involves the regulation of such property to prevent its use thereof in a manner that is detrimental to the public interest.
J. Sackman, Nichols' The Law of Eminent Domain § 1.42, at 1-133 to 1-134 (rev. 3rd ed.1988) (footnotes omitted, emphasis in original).
Id. at 624-25 (footnote and parallel citations omitted). Regardless of whether the property is taken for public use under the power of eminent domain or is destroyed under the police power because it is deemed detrimental to the public interest, the end result for the property owner is a deprivation of his or her private property.
This case involves the destruction of private property under the State's *782 police power, which implicates substantive due process concerns. As they did below, the parties first dispute the appropriate standard of review to be applied in deciding whether the 2002 amendment to section 581.184 denies substantive due process. The petitioners assert that because the Citrus Canker Law infringes on fundamental property rights it can be upheld under this Court's decision in Corneal v. State Plant Board, 95 So.2d 1, 4, 6 (Fla. 1957), only if the threat is "imminently dangerous" and the 1900-foot destruction radius is "justified only within the narrowest limits of actual necessity." This standard is similar to the "strict scrutiny" standard of review, which requires that the State prove that the legislation furthers a compelling State interest through the least intrusive means. See Chiles v. State Employees Attorneys Guild, 734 So.2d 1030, 1033 (Fla.1999); see also In re Forfeiture of 1969 Piper Navajo, 592 So.2d 233, 235 (Fla.1992) (indicating that a forfeiture statute must be narrowly tailored to achieve the State's objective through the least intrusive means). In a strict scrutiny analysis, legislative conclusions are not taken at face value and "do not ... obviate the need for judicial scrutiny." Chiles, 734 So.2d at 1034 (quoting Chiles v. State Employees Atty's Guild, 714 So.2d 502, 506 (Fla. 1st DCA 1998)).
The Department, on the other hand, contends that because the Citrus Canker Law is a valid exercise of the State's police power to protect the health, welfare, and safety of the public, all that is required is that the law not be arbitrary or capricious, and the Court need only determine that the law bears a reasonable and substantial relationship to the purpose sought to be attained. Under this standard of review, referred to as either the reasonable relationship or the rational basis test, a "state statute must be upheld... if there is any reasonable relationship between the act and the furtherance of a valid governmental objective." Lane v. Chiles, 698 So.2d 260, 262 (Fla.1997) (emphasis supplied). Specifically, with respect to substantive due process, a statute is valid if it "bears a rational relation to a legitimate legislative purpose in safeguarding the public health, safety, or general welfare and is not discriminatory, arbitrary, or oppressive." Chicago Title Ins. Co. v. Butler, 770 So.2d 1210, 1215 (Fla. 2000). In applying this standard of review, a court must remain "cognizant of the legislature's broad range of discretion in its choice of means and methods by which it will enhance the public good and welfare." Horsemen's Benevolent & Protective Ass'n v. Div. of Pari-Mutuel Wagering, 397 So.2d 692, 695 (Fla.1981); see also Eastern Air Lines, Inc. v. Dep't of Revenue, 455 So.2d 311, 314 (Fla.1984) (under the rational basis test "[t]he burden is on the one attacking the legislative enactment to negate every conceivable basis which might support it").
Because the Fourth District concluded that the Citrus Canker Law is a valid exercise of the State's police power and provides for compensation for the destruction of trees having value, the court determined that the reasonable relationship test applied. See Haire, 836 So.2d at 1050-51. We agree with this determination.
Broadly speaking, the police power allows the State to adopt statutory regulations for the protection of the health, safety, morals and general welfare of the public. See Graham v. Estuary Props., Inc., 399 So.2d 1374, 1379 (Fla.1981); State Plant Bd. v. Smith, 110 So.2d 401, 405 (Fla.1959). Regarding this case, there is no question that the protection of the citrus industry is a legitimate objective for the use of the State's police power. See Dep't of Agric. & Consumer Servs. v. Mid-Florida Growers, Inc., 521 So.2d 101, 103 *783 (Fla.1988) (Department's order requiring the destruction of healthy but suspect citrus trees was a valid exercise of police power); Coca-Cola Co. v. State Dep't of Citrus, 406 So.2d 1079, 1085 (Fla.1981) ("Police power based regulations of Florida's citrus industry have been upheld in many cases."); Johnson v. State, 99 Fla. 1311, 128 So. 853, 857 (1930) (it is within the State's police power to protect the citrus industry, which directly or indirectly affects the welfare of a great portion of the population of the State). In fact, the petitioners do not dispute that the State has broad latitude to use its police powers to protect the citrus industry. Further, although the petitioners challenge the Legislature's characterization of the emergency nature of citrus canker's effect on the citrus industry,[7] the trial court made no findings of fact contrary to the Legislature's findings in this regard. Thus, we find no basis for concluding that the eradication of citrus canker is not a legitimate use of the State's police power.
With respect to the issue of the appropriate standard of review, we have held that "[a]ll ... property rights are held subject to the fair exercise of the [police] power," Golden v. McCarty, 337 So.2d 388, 390 (Fla.1976) (emphasis supplied),[8] and have used the reasonable relationship test, which the State asserts is applicable in this case, to evaluate statutes and regulations that infringe on property rights.[9] However, we have also recognized that the "absolute destruction of property is an extreme exercise of the police power and is justified only within the narrowest limits of actual necessity, unless the state chooses to pay compensation." Corneal, 95 So.2d at 4 (emphasis supplied). We have explained that
"[w]here property is destroyed in order to save property of greater value, a provision *784 for indemnity is a plain dictate of justice and of the principle of equality," and ... that statutory regulation of the power to destroy property in this situation "is always accompanied by statutory duty of compensation."
Id. (quoting Ernst Freund, The Police Power: Public Policy and Constitutional Rights, §§ 534-35, at 564-65 (1904)) (alteration in original).
In Corneal, this Court specifically addressed the State's destruction of healthy citrus trees as a means of controlling the spread of a citrus disease known as "spreading decline." See id. at 2-3. The rule adopted by the State Plant Board to control the disease required the removal and burning of both infected and uninfected trees within a certain distance from infected trees. See id. at 3. The Court cited domestic animals infected with a contagious disease and a burning building as examples of circumstances that justify the destruction of property without compensation. See id. at 4. Distinguishing those situations, the Court held that because the burrowing nematode, which causes spreading decline, offers "no immediate menace to the trees in a neighboring grove" and the healthy citrus trees were not "imminently dangerous," the regulation requiring the destruction of healthy trees without compensation exceeded the scope of the State's police powers. Id. at 6.
Under Corneal, in order for the Legislature to enact a valid statute pursuant to its police power that results in a total destruction of property without compensation, the statute must be justified by "the narrowest limits of actual necessity" and the threat must be "imminently dangerous." However, as explained by the Fourth District:
[W]here compensation is given, the statute need only pass the reasonable relationship test. Indeed, if it were otherwise, then all condemnation proceedings would be governed by the narrow tailoring standard, which is not the case. See, e.g., Canal Auth. v. Miller, 243 So.2d 131, 134 (noting reasonable necessity, not absolute necessity, is the standard for eminent domain). The cases requiring narrow tailoring, including In re Forfeiture, involve forfeitures of property without compensation for the takings. The requirement of just compensation for a taking substitutes one form of property, e.g., tangible property, for another, money. A forfeiture, on the other hand, results in an actual loss of all property to the owner.
Haire, 836 So.2d at 1051.
The petitioners claim that Corneal's strict standard of review applies to the Citrus Canker Law because the statute does not obligate the State to pay just and full compensation, even though section 581.1845 requires the Department to provide compensation "to eligible homeowners whose citrus trees have been removed under a citrus canker eradication program." § 581.1845(1). The petitioners contend that the compensation provided for in section 581.1845 is inadequate to bring the statute within the ambit of the deferential reasonable relationship test because it represents only "token compensation" rather than full and just compensation, and because it is subject to Legislative appropriations.
The petitioners specifically point to the statutes at issue in State Plant Board v. Smith, 110 So.2d 401 (Fla.1959), and Department of Agriculture & Consumer Services v. Bonanno, 568 So.2d 24 (Fla.1990), as compensation statutes that meet the requirements of Corneal. In Smith, this Court reviewed an act adopted by the Legislature in response to Corneal, which provided for the payment of compensation for the destruction of uninfected trees, "not to *785 exceed $1,000.00 per acre." Smith, 110 So.2d at 403. Although the Court held that the Legislature could not fix the maximum amount of compensation and found that portion of the statute invalid, see id. at 406-07, the Court further held that the remainder of the statute met the requirements of "just compensation" because it required the Plant Board to pay "just and fair compensation" to citrus growers who had their trees removed. See id. at 406.
Bonanno involved a challenge to an administrative presumptive compensation schedule adopted by the Legislature to compensate owners whose trees were destroyed as a result of the citrus canker eradication program. See 568 So.2d at 27. In upholding the statute, this Court reasoned, in part, that the statute set a floor on the value of destroyed plants, which the owner could rebut with evidence showing that in a particular case those values would not provide just compensation. See id. at 31.
In this case, we conclude that under the statutory scheme the State is obligated to provide more than token compensation if the State has destroyed a healthy, albeit exposed tree.[10] Section 581.1845 expressly states that the specified per-tree amount "does not limit the amount of any other compensation that may be paid ... pursuant to court order for the removal of citrus trees as part of a citrus canker eradication program." § 581.1845(4) (emphasis supplied). Thus, the Citrus Canker Law sets a compensation floor that is consistent with the established principle that "the determination of what is just compensation... is a judicial function that cannot be performed by the Legislature." Smith, 110 So.2d at 407 (quoting Spafford v. Brevard County, 92 Fla. 617, 110 So. 451, 454 (1926)).
In accord with our precedent, we conclude that the schedule established by the Legislature sets a floor but does not determine the amount of compensation. When the State destroys private property, the State is obligated to pay just and fair compensation as determined in a court of law. We emphasize that the fact that the Legislature has determined that all citrus trees within 1900 feet of an infected tree must be destroyed does not necessarily support a finding that healthy, but exposed, residential citrus trees have no value.[11]
Moreover, the statement in section 581.1845 that compensation is subject to the availability of appropriated funds does not relieve the State from its responsibility to provide full and just compensation. The State conceded this point during oral argument, observing that this is nothing more than a reiteration of the language in section 11.066(3), Florida Statutes (2003), which expressly provides that "[n]either the state nor any of its agencies *786 shall pay or be required to pay monetary damages under the judgment of any court except pursuant to an appropriation made by law." We agree that this proviso is not a limit on the State's obligation to pay compensation for the destruction of exposed citrus trees.
With this important clarification of the challenged statute, we conclude that the Fourth District properly applied the reasonable relationship test. We next consider whether the Fourth District correctly concluded that the Citrus Canker Law did not violate substantive due process because it was "neither arbitrary nor capricious and bears a reasonable relationship to the goal of canker eradication." Haire, 836 So.2d at 1053.
In holding section 581.184 unconstitutional the trial court focused not only on the perceived lack of compensation for the removal of healthy trees but also on its finding that the science underlying the Gottwald study is unsound and, therefore, not an acceptable basis for the Legislature to enact the 1900-foot removal radius. See id. at 1046-47. In reversing the trial court, the Fourth District concluded that the trial court erred in rejecting the legislative choice based on its own view of the scientific evidence and improperly substituted its judgment for that of the Legislature, which determined that the 1900-feet eradication zone was justified by the best available science. See id. at 1053 ("The trial court erred in rejecting the legislative choice based upon the court's own view of the scientific evidence presented."). We agree.
The Legislature had before it a published scientific study that concluded that a 1900-foot removal radius was required to successfully eradicate citrus canker. The fact that the Legislature did not subject the Gottwald report to an adversarial trial or the requirements of courtroom admissibility under the Frye[12] test does not make the Legislature's action in adopting the 1900-foot removal radius arbitrary or capricious, or not reasonably related to the goal of citrus canker eradication. In addition, the fact that the trial court heard testimony during a ten-day hearing, whereas the Legislature did not, is not a significant consideration under rational basis review. That there was conflicting evidence presented to the trial court regarding the appropriateness of Dr. Gottwald's methods indicates that the issue of whether to adopt Dr. Gottwald's conclusions was a matter of debate for the Legislature.[13] As Judge Warner explained in her well-reasoned opinion in this case:
[L]egislatures are not limited to acting only where there is scientific certainty. See Johnson v. City of Cincinnati, 310 F.3d 484, 504 (6th Cir.2002) (citing Ginsberg v. New York, 390 U.S. 629, 642, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968)). "To make scientific precision a criterion of constitutional power would be to subject the state to an intolerable supervision hostile to the basic principles of our government...." Sproles v. Binford, 286 U.S. 374, 388, 52 S.Ct. 581, 76 L.Ed. 1167 (1932). Here, the Legislature had before it the advice of the Technical Advisory Board, which reviewed the study, along with the state's practical experience in fighting citrus canker for nearly twenty years. The study it relied upon was peer reviewed and published, two strong indicators of general acceptance in the scientific community.

*787 "When the subject lies within the police power of the state, debatable questions as to reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment...." Id. at 388-89, 52 S.Ct. 581. See also Gandy v. Borras, 114 Fla. 503, 154 So. 248, 249 (1934). The trial court believed the Legislature should have subjected the study to adversarial testing, as in a trial. However, under a rational basis test, "a legislative choice is not subject to courtroom fact-finding...." F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).
Haire, 836 So.2d at 1052 (parallel citations omitted).
Whether the best means of eradicating citrus canker have been chosen by the Legislature is a question directed more towards the wisdom of the legislation than to its asserted rationality. See Coca-Cola Co., 406 So.2d at 1085. Although such an inquiry is appropriate under the strict scrutiny standard of review, which requires that the legislative conclusions be subjected to strict judicial scrutiny, it is an inappropriate judicial inquiry under the rational basis standard of review. Even the petitioners conceded at oral argument that under rational basis review it was within the Legislature's discretion to adopt the 1900-foot removal radius based on the Gottwald report. As Judge Warner concluded:
[T]he Legislature's action was amply supported by the scientific studies and Florida's practical experience with citrus canker. The Legislature followed the recommendations of the scientific community to eradicate the disease. Destruction of exposed trees and those within the area where the disease is likely to spread is neither arbitrary nor capricious and bears a reasonable relationship to the goal of canker eradication. The trial court erred in rejecting the legislative choice based upon the court's own view of the scientific evidence presented.
Haire, 836 So.2d at 1052-53 (citation omitted). We agree with this determination and for all the reasons discussed above conclude that the Citrus Canker Law withstands the substantive due process challenge.

B. Procedural Due Process
"Procedural due process serves as a vehicle to ensure fair treatment through proper administration of justice where substantive rights are at issue," Dep't of Law Enforcement, 588 So.2d at 960, and requires both fair notice and a reasonable opportunity to be heard. See Keys Citizens for Responsible Gov't, Inc. v. Fla. Keys Aqueduct Auth., 795 So.2d 940, 948 (Fla.2001). The petitioners do not assert that section 581.184 provides for inadequate notice of the intended removal of exposed trees, but contend that the lack of a pre-deprivation hearing denies tree owners a meaningful opportunity to be heard on the propriety of the Department's removal order.
In Smith, this Court addressed the summary destruction of citrus trees pursuant to the State's "pull and treat" program implemented for containing and eradicating spreading decline disease, and held that absent an imminent danger of the spread of the disease, summary destruction of both infected and uninfected trees was a violation of procedural due process. See 110 So.2d at 409. In concluding that no imminent danger of spread existed with respect to spreading decline, the Court relied on the facts developed in Corneal that showed that the burrowing nematode that caused the disease "travels underground from one tree to another at an *788 average rate throughout the state of 1.6 trees, or 36 feet, per year." Id. at 408 (quoting Corneal, 95 So.2d at 2). The Court expressly noted that spreading decline "is not carried by the wind or by insects from grove to grove." Id. (emphasis supplied).
As recognized by several of the district courts of appeal, citrus canker, unlike spreading decline, has the potential to be carried great distances by wind and rain. See Sapp Farms, Inc. v. Fla. Dep't of Agric. & Consumer Servs., 761 So.2d 347, 348 (Fla. 3d DCA 2000); Nordmann v. Fla. Dep't of Agric. & Consumer Servs., 473 So.2d 278, 280 (Fla. 5th DCA 1985); Denney v. Conner, 462 So.2d 534, 536 (Fla. 1st DCA 1985). In Denney, the First District, in reviewing an immediate final order issued by the Department, held that the "department has shown that the threat to the public interest in the citrus industry represented by citrus canker is of sufficient gravity and urgency that the effect of the immediate final order ... should not be further stayed." 462 So.2d at 536-37. Relying on Denney, the Fifth District held that the Department could constitutionally order the destruction of suspect citrus trees by immediate final order. See Nordmann, 473 So.2d at 280. Thus, this Court's conclusion in Smith that summary proceedings were not justified to eradicate spreading decline does not apply to citrus canker. Cf. Conner v. Carlton, 223 So.2d 324, 327 (Fla.1969) (indicating that summary eradication of a plant disease is warranted when it shows its emergent or epidemic effects); Campoamor v. State Live Stock Sanitary Bd., 136 Fla. 451, 182 So. 277, 280 (1938) ("[W]hen epidemics arise or are threatened or when the common good is otherwise in hazard, summary proceedings may be authorized....").
Moreover, in light of our conclusion that the Citrus Canker Law does not violate substantive due process by requiring the destruction of "exposed" citrus trees, the only required showing by the Department prior to destruction of a particular tree is that the tree marked for removal is within 1900 feet of an infected tree. Whether the Department establishes this required showing is the issue to be considered by the appellate court in an appeal of the IFO, allowing homeowners to seek review of the relevant facts prior to destruction. Accordingly, we approve the Fourth District's conclusion that the Citrus Canker Law does not deny homeowners procedural due process.

III. SEARCH WARRANT RESTRICTIONS
The petitioners also seek review of the Fourth District's decision to quash the trial court's orders restricting the Department's application for search warrants. These restrictions require that the Department submit a single application and obtain a single warrant for each piece of property to be searched, and prohibit the warrants from being signed by the magistrate by electronic signature. The Fourth District held that it is within the magistrate's discretion to decide both whether to issue multiple warrants or a single warrant to search multiple properties based on a single application, and whether to use an electronic signature. See Haire, 836 So.2d at 1059. We review each of these issues in turn.

A. Single Warrant for Multiple Properties
Chapter 933, Florida Statutes (2003), provides for the issuance of a warrant upon proper affidavits which provide probable cause for the search and particularly describe the place to be searched. See §§ 933.02, 933.04, Fla. Stat. (2003). As noted by the Fourth District, there is nothing in chapter 933 that indicates that *789 if a single affidavit meets these requirements with respect to multiple properties, multiple warrants could not be issued based on a single application and affidavit. See Haire, 836 So.2d at 1059.
Further, we reject the petitioners' argument that because search warrant statutes are to be strictly construed, see, e.g., Morris v. State, 622 So.2d 67, 68 (Fla. 4th DCA 1993), chapter 933 must expressly authorize the issuance of multiple warrants based on a single affidavit in order for a magistrate to have the discretion to do so. Orange County v. Fordham, 160 Fla. 259, 34 So.2d 438, 440 (1948), the case cited by the petitioners to support this contention, involved the eminent domain powers of a county, which the Court stated must generally "clearly and affirmatively" appear in the statute. With regard to search warrants, the magistrate's power to issue a warrant is based on the State's compliance with the affidavit requirements and a showing of probable cause. Because these requirements can be met by one affidavit where it establishes probable cause to search multiple properties, there is no need to rely on implied authority, which was the concern expressed by the Court in Fordham.
In addition, the purpose of the particularity requirement of warrants is to "stand[ ] as a bar to exploratory searches by officers armed with a general warrant... [and to] limit[ ] the searching officer's discretion in the execution of a search warrant, thus safeguarding the privacy and security of individuals against arbitrary invasions by governmental officials." Carlton v. State, 449 So.2d 250, 252 (Fla. 1984). We conclude that this purpose is served so long as the affidavit supports probable cause for the search of the named properties and those properties are described with particularity. See generally State v. Davis, 637 So.2d 1012, 1021-22 (La.1994) (one affidavit was legally sufficient for multiple search warrants where the information in the affidavit provided the magistrate with substantial basis for authorizing each warrant); Huff v. Commonwealth, 213 Va. 710, 194 S.E.2d 690, 695 (1973) ("So long as the affidavit remains sufficient to support a finding of probable cause, nothing forbids the issuance of more than one warrant."). Thus, the Fourth District did not err in quashing the trial court's order requiring the Department to submit a single warrant application for each individual property.

B. Electronic Signature
In holding that the affixing of an electronic signature of a judge to a warrant is within the discretion of the issuing magistrate, the Fourth District reasoned that "[w]hen a judge issuing a warrant directs the use of an electronic signature, it is clear that the judge is attesting to the act of issuing the warrant." Haire, 836 So.2d at 1059-60. We agree with this reasoning, which is consistent with the general rule that in absence of a statute or rule prescribing the method of a signature, a signature may be validly affixed by a number of different means. See Wemett v. State, 536 So.2d 349, 350-51 (Fla. 1st DCA 1988) (lack of original signature did not make notice of appeal defective); State v. Hickman, 189 So.2d 254, 258 (Fla. 2d DCA 1966) (concluding that a warrant signed by facsimile signature affixed by the clerk was not defective); see also Biegeleisen v. Ross, 158 F.3d 59, 60 (2d Cir.1998) ("[A]bsent some concrete indication of misuse or fraud, we find no reason to doubt that a duly authorized signature stamp carries the same authority as an original signature."); United States v. Juarez, 549 F.2d 1113, 1114-15 (7th Cir.1977) (magistrate's signature stamp on a search warrant did not render it invalid); *790 People v. Stephens, 12 Ill.App.3d 215, 297 N.E.2d 224, 226 (1973) (search warrant bearing only a stamped signature of the magistrate was authentic); In re Barber, 982 S.W.2d 364, 367 (Tex.1998) (judge's signature on an order may be affixed by facsimile stamp).
In addition, the Legislature's enactment of the "Electronic Signature Act of 1996," which specifically provides that "[u]nless otherwise prohibited by law, an electronic signature may be used to sign a writing and shall have the same force and effect as a written signature," § 668.004, Fla. Stat. (2003), indicates an increasing acceptance of this alternative signature form. See also In re Amendments to the Rules of Judicial AdministrationRule 2.090, 681 So.2d 698, 700 (Fla.1996) (this Court stating its intention to "cooperate with the Secretary of State in implementing any electronic signature processes and procedures in the court system"). Accordingly, we approve of the Fourth District's decision to quash the portion of the trial court's order that prohibited the issuing magistrate from signing warrants with an electronic signature.

CONCLUSION
We recognize that the destruction of noncommercial citrus trees has become an emotionally charged issue for those whose trees are affected. We emphasize that our decision today is not a judgment on the sentimental or economic value these trees have to those who own them. This Court is required to uphold laws passed by the Legislature that meet the requirements of the state and federal constitutions. Because the State has chosen to pay compensation for those healthy but exposed trees that are destroyed under the Citrus Canker Eradication Program, under our deferential standard of review we must defer to the Legislature's evaluation of the relevant scientific evidence and to the Legislature's choice of means to eradicate citrus canker. Accordingly, we approve the Fourth District's decision in this case, which declared the Citrus Canker Law constitutional and quashed the trial court's orders placing restrictions on the Department's ability to obtain search warrants.
It is so ordered.
ANSTEAD, C.J., and LEWIS and QUINCE, JJ., concur.
WELLS, J., concurs in result only with an opinion, in which BELL, J., concurs.
CANTERO, J., recused.
WELLS, J., concurring in result only.
I concur with the decision of the Court. I do not join in the opinion. I would simply adopt the well-reasoned opinion of Judge Warner in the district court. Fla. Dep't of Agric. & Consumer Servs. v. Haire, 836 So.2d 1040 (Fla. 4th DCA 2003). Judge Warner's opinion directly covers all points in this controversy.
BELL, J., concurs.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(3), Fla. Const.
[2] The study was conducted by Dr. Timothy Gottwald, a United States Department of Agriculture scientist and an expert in epidemiology, plant pathology and citrus canker.
[3] This section is repealed effective July 1, 2005, and will be reviewed by the Legislature prior to that date. See ch.2002-11, § 4, at 314, Laws of Fla. Prior to these amendments, there was no statutorily set distance of removal. Instead, in 2000, the Legislature defined citrus trees "[e]xposed to infection" as those "harboring the citrus canker bacteria due to their proximity to infected citrus trees, and which do not yet exhibit visible symptoms of the disease but which will develop symptoms over time, at which point such trees will have infected other citrus trees." Ch.2000-308, § 2, at 3226, Laws of Fla.
[4] The statutes do not further define a Shade Dade or Shade Florida Card. However, a press release from the Department announcing the program indicates that these are gift cards redeemable at Wal-Mart for non-citrus trees and other garden related items. See Press Release, Liz Compton, Fla. Dep't of Agric. & Consumer Servs., Crawford Announces Receipt Of Shade Florida Funds And Agreement With Retailer (April 28, 2000), available at http://doacs.state.fl.us/press/2000/04282000.html.
[5] The compensation clause of Fifth Amendment to the United States Constitution provides: "[N]or shall private property be taken for the public use, without just compensation." Article X, section 6 of the Florida Constitution provides in pertinent part: "No private property shall be taken except for a public purpose and with full compensation...."
[6] The due process clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." The Fourteenth Amendment to the United States Constitution provides in pertinent part that no State shall "deprive any person of life, liberty or property without due process of law." Article I, section 9 of the Florida Constitution similarly provides that "[n]o person shall be deprived of life, liberty or property without due process of law."
[7] Two years prior to the enactment of the amendments at issue in this case, the Legislature set forth the following relevant findings regarding citrus canker's effect on the citrus industry in Florida:

WHEREAS, an emergency exists in the South Florida area regarding the spread of citrus canker, a bacterial disease that damages fruit, weakens and eventually kills trees, is highly contagious, and the presence of which causes quarantines to be imposed on the shipment of fresh fruit, and
WHEREAS, joint state and federal attempts to eradicate citrus canker have so far been unsuccessful, and
WHEREAS, despite destruction of citrus trees infected with citrus canker and of citrus trees within 125 feet of canker-infected trees, citrus canker has spread at an alarming rate and is now present throughout Miami-Dade County and Broward County, and
WHEREAS, if not eradicated quickly, citrus canker will spread to other parts of the state and may destroy the citrus industry and dooryard citrus throughout Florida,....
Ch.2000-308, at 3225, Laws of Fla.
[8] See also Adams v. Housing Auth. of Daytona Beach, 60 So.2d 663, 666 (Fla.1952) ("[T]he police power is that power by which the Government may destroy or regulate the use of property in order to promote the health, morals, and safety of the community ....") (internal quotation marks omitted), overruled in part on other grounds by Baycol, Inc. v. Downtown Dev. Auth., 315 So.2d 451 (Fla.1975).
[9] See, e.g., Dep't of Community Affairs v. Moorman, 664 So.2d 930, 933 (Fla.1995) (applying the test to land use ordinance which prohibited the erection of fencing); Shriners Hospitals for Crippled Children v. Zrillic, 563 So.2d 64, 68-69 (Fla.1990) (applying the test to statute that restricted charitable devises); McCarty, 337 So.2d at 390 (applying the test to statute that required tattooing be done by a person licensed to practice medicine or dentistry, thereby voiding the occupational licenses of the plaintiff); Palm Beach Mobile Homes, Inc. v. Strong, 300 So.2d 881, 884 (Fla.1974) (applying the test to a statute that placed limits on mobile home park owners' ability to evict mobile home owners, thereby restricting the use of mobile home park owners' property).
[10] The petitioners agree that if a citrus tree shows visible signs of the disease and is therefore "infected," there is no compensable taking.
[11] A related issue regarding the payment of compensation is currently before the Court in Patchen v. State Department of Agriculture & Consumer Services, 817 So.2d 854 (Fla. 3d DCA), review granted, 829 So.2d 919 (Fla. 2002). In Patchen, the Third District certified the following question of great public importance:

Does the Florida Supreme Court's decision in Department of Agriculture & Consumer Services v. Polk, 568 So.2d 35 (Fla.1990), which held that the Department's destruction of healthy commercial citrus nursery stock within 125 feet of trees infected with citrus canker did not compel state reimbursement, also apply to the Department's destruction of uninfected, healthy noncommercial, residential citrus trees within 1900 feet of trees infected with citrus canker?
817 So.2d at 855-56.
[12] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[13] We note that during the floor debate conducted in the House of Representatives legislators expressed views both in support of and against the science.