**ALLIANCE OF AUTOMOBILE MANUFACTURERS, INC.,**
**Plaintiff,**

v.

**Julie L. JONES, in her official capacity as the Executive Director of the Department of Highway Safety and Motor Vehicles of the State of Florida, Defendant,**

**Florida Automobile Dealers Association, Defendant–Intervenor.**

Case No. 4:08cv555/MCR/CAS.

United States District Court, N.D. Florida, Tallahassee Division.

Sept. 20, 2012.

David Bruce Salmons, Bingham McCutchen LLP, Washington, DC, Dean B. Bunch, Nelson Mullins Riley etc LLP, Major Best Harding, Ausley & McMullen, Tallahassee, FL, Alicia L. Downey, Daniel L. Goldberg, James Chafel McGrath, Bingham McCutchen LLP, Boston, MA, for Plaintiff.

Jonathan Alan Glogau, Tallahassee, FL, for Defendant.

Allen C. Winsor, GrayRobinson PA, Tallahassee, FL, for Defendant–Intervenor.

### *ORDER*

M. CASEY RODGERS, Chief Judge.

The Plaintiff, the Alliance of Automobile Manufacturers, Inc. ("the Alliance"), brought this action challenging the constitutionality of Chapter 320, Florida Statutes, which regulates the relationship between motor vehicle manufacturers and dealers in the state of Florida.[1] The Defendant, Julie Jones, in her official capacity as the Executive Director of the Department of Highway Safety and Motor Vehicles of the State of Florida ("DHSMV"), and Defendant-intervenor, the Florida Automobile Dealers Association ("FADA") (referred to collectively as "defendants"), filed a motion to dismiss the Alliance's complaint (doc. 46), arguing that the Alliance has failed to state a claim upon which relief can be granted.[2] The Alliance responded in opposition to the motion, and the defendants were granted leave of court to submit a reply.[3] Having reviewed the motion, responses, and reply, and heard oral argument from counsel, the court finds that the motion should be granted in part and denied in part.

### BACKGROUND [4]

The Alliance is a non-profit trade association comprised of eleven motor vehicle manufacturers and distributors ("Members") that sell new motor vehicles and replacement parts throughout the United States.[5] In order to conduct business in the state of Florida, each of the Alliance's

1. The Alliance filed the action in the Circuit Court of the Second Judicial District of Leon County, Florida. It was removed to this court based on the court's subject matter jurisdiction. After the matter was removed, the Alliance filed an amended complaint (*see* doc. 42), which is the complaint to which the court refers throughout this order.

2. Jones, the current Executive Director of DHSMV, was substituted as the proper defendant on August 18, 2011.

3. In addition to its initial response to the motion to dismiss, the Alliance was granted leave of court to file a supplemental response. DHSMV and FADA requested leave to submit a reply to the Alliance's supplemental response, which the court granted.

4. Because this matter is before the court on the defendants' motions to dismiss, the facts set forth in the Alliance's complaint are taken as true and the court considers only the pleadings and the exhibits attached thereto. *See Burnett v. City of Jacksonville, FL,* 376 Fed.Appx. 905, 906 (11th Cir.2010).

5. The Alliance's members include BMW Group; Chrysler LLC; Ford Motor Company; General Motors Corporation; Jaguar Land Rover; Mazda Motor of America, Inc.; Mercedes–Benz USA, LLC; Mitsubishi Motor Sales of America, Inc.; Porsche Cars North America, Inc.; Toyota Motor Sales, Inc.; and Volkswagen Group of America, Inc.

Members must secure a license. *See* Fla. Stat. § 320.61, Fla. Stat. To maintain the license, the Members are required to comply with Florida's laws governing the relationship between motor vehicle licensees and dealers.[6] In Florida and elsewhere, licensees are required to distribute new motor vehicles through independently owned and operated authorized dealers who, in turn, sell or lease the vehicles to retail customers.[7] In order to facilitate distribution of their vehicles, the Members enter into contracts with dealers ("Dealer Agreements") pursuant to which the dealers agree to promote and sell the Members' vehicles and provide certain maintenance and repair services.[8] According to the Alliance, unless state law provides otherwise, the Members typically reimburse their dealers for maintenance and repair services based on a uniform methodology that provides for a markup over the dealer cost of the parts or a pre-existing parts price, such as the Manufacturer Suggested Retail Price, plus an approved rate for labor.[9] Although warranty and other covered repairs and services are provided to the consumer at no additional charge at the time of service, the cost of such repairs and services is included in the wholesale price of each new motor vehicle. Members also offer bonus, incentive, and other benefit programs to dealers.

Through this action, the Alliance seeks to invalidate three laws governing the relationship between motor vehicle licensees and dealers in the state of Florida, which the Alliance contends are unconstitutional. The first statute the Alliance challenges is Fla. Stat. § 320.696(3) and (4) (the "Parts and Labor Reimbursement Provisions"), which requires licensees to compensate dealers for parts and labor used in performing work pursuant to a warranty, maintenance plan, extended warranty, certified pre-owned warranty, service contract, delivery or preparation procedure, recall, campaign service, authorized goodwill, directive, or bulletin at certain rates in the event the parties cannot agree to a rate within thirty days of the dealer's written request that they attempt to do so. *See* Fla. Stat. § 320.696(3)(a), (4)(b).[10] The

6. Due to the widely recognized unequal bargaining power between motor vehicle manufacturers and dealers, Florida, like most states, has regulated the industry for decades.

7. With certain limited exceptions, the Members are prohibited under Florida law from owning retail dealerships and service facilities and from selling vehicles directly to the public. *See* Fla. Stat. §§ 320.645, 320.64(24).

8. Members provide, either directly or through parent companies, a limited warranty of various parts, systems, and accessories and, under certain circumstances, agree to pay for goodwill or special policy repairs beyond the period of the warranty. Certain Members also provide customers with a scheduled maintenance plan in connection with the customers' purchase of a new motor vehicle.

9. The approved labor rate typically is based on an average of the dealer's established retail rate or a formula designed to approximate such rate multiplied by the number of labor

hours allotted for the particular repair or service, as set forth in a labor time guide. Some Members enter into labor rate agreements with their dealers pursuant to which the parties agree on an initial labor rate for covered repairs, with annual adjustments based on the Consumer Price Index or similar benchmark.

10. In the event an agreement is not reached regarding parts prices, the licensee must compensate the dealer at the greater of (1) the dealer's arithmetical mean percentage markup over dealer cost for all parts charged by the dealer in fifty consecutive retail customer repairs within the three-month period before the dealer's written request for a change in reimbursement or all of the retail repair orders over that three-month period if there are fewer than fifty retail customer repair orders; (2) the licensee's highest suggested retail or list price for the parts; or (3) an amount equal to the dealer's markup over dealer cost that results in the same gross profit percent-

Alliance claims that the Parts and Labor Reimbursement Provisions violate the Due Process Clause of the Florida Constitution and the Contracts Clauses of the United States and Florida Constitutions. The second statute the Alliance challenges is Fla. Stat. § 320.696(6) (the "Recoupment Bar"), which prohibits licensees from directly or indirectly recovering the costs of compensating dealers under the Parts and Labor Reimbursement Provisions. According to the Alliance, the Recoupment Bar discriminates on its face and in its effects against out-of-state manufacturers, dealers, and consumers in violation of the Commerce Clause of the United States Constitution. The Alliance also alleges that the Recoupment Bar violates the Contracts Clauses of the United States and Florida Constitutions. Finally, the Alliance challenges Fla. Stat. § 320.64(38) (the "Extraterritorial Benefit Restriction"), which requires licensees to offer in Florida any bonus, incentive, or other benefit program offered nationally or in the same zone or business region as the state of Florida unless the failure or refusal to offer the program in Florida is reasonably supported by substantially different economic or marketing considerations than are applicable to the licensee's same line-

make dealers in this state. The Alliance alleges that the Extraterritorial Benefit Restriction is unconstitutional on its face because it regulates and impacts interstate commerce in violation of the Commerce Clause. The Alliance seeks a declaratory judgment that (1) the Enhanced Parts and Labor Reimbursement Provisions are unconstitutional in their effects; (2) the Recoupment Bar is unconstitutional on its face and in its effects; and (3) the Extraterritorial Benefit Restriction is unconstitutional on its face. The Alliance also seeks a declaration that the reduction or elimination of incentive, bonus, or other benefit programs in the state of Florida in response to higher parts and labor reimbursement costs does not constitute the direct or indirect recovery of costs under the Recoupment Bar and that, even if it does, such action is justified by economic considerations under the Extraterritorial Benefit Restriction and that an interpretation of the Recoupment Bar and Extraterritorial Benefit Restriction as prohibiting the economically justifiable reduction or elimination of incentive, bonus, or other benefit programs is unconstitutional.

The defendants seek dismissal of each of the Alliance's claims, arguing that the

age for parts used in warranty and other covered repair and service work as the dealer receives for parts used in customer retail repairs, as evidenced by the average of the dealer's gross profit percentage in the dealer's financial statements for the two months preceding the dealer's request. Fla. Stat. § 320.696(3)(a). In the event an agreement is not reached regarding labor rates, the licensee must pay the dealer the greater of (1) the dealer's hourly labor rate used for retail customer repairs, determined by dividing the amount of the dealer's total labor sales for retail customer repairs by the number of total labor hours that generated those sales for the month preceding the request; or (2) an amount equal to the dealer's markup over dealer cost that results in the same gross profit percentage for labor hours performed

in warranty and other covered repair and service work as the dealer receives for labor performed in its customer retail repairs, as evidenced by the average of the dealer's gross profit percentage in the dealer's financial statements provided to the licensee for the two months preceding the dealer's written request, if the dealer provides in the written request the arithmetical mean of the hourly wage paid to all of its technicians during that preceding month, with the arithmetical mean being the dealer cost used in the calculation. Fla. Stat. § 320.696(4)(b). The Act excludes certain parts and repairs for purposes of determining the percentage markup and labor rate based on the dealer's repair orders, including parts and labor used in special events, specials, and promotions. Fla. Stat. § 320.696(3)(b) and (4)(c).

Alliance has failed to state a claim upon which relief can be granted. Specifically, with regard to the Alliance's challenges to the Parts and Labor Reimbursement Provisions, the defendants argue that the statute is rationally related to the state's interest in addressing the disparity in bargaining power between motor vehicle manufacturers and dealers and that the Alliance's due process claim thus fails. The defendants also argue that the Alliance lacks standing to assert a Contract Clause claim on behalf of its Members. Regarding the Alliance's challenges to the Recoupment Bar, the defendants argue that the statute does not discriminate on is face because it applies equally to all manufacturers, regardless of residency; the defendants maintain that the Alliance's as applied challenge is not ripe because the Recoupment Bar has not yet been applied and its effects therefore are speculative and unknown. As to the Extraterritorial Benefit Restriction, the defendants insist that it can be constitutionally applied in certain circumstances and that the Alliance's facial challenge to the statute thus fails under *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). The defendants also argue that the Alliance's challenge to the Extraterritorial Benefit Restriction is not ripe because the Alliance has failed to allege concrete facts regarding specific benefit programs that will be affected by the statute and that the plaintiffs will suffer no injury from a delay in adjudication of the claim until they are in a position to allege concrete facts in support thereof. Finally, the defendants urge the court to dismiss Counts IV and V of the Alliance's complaint on ripeness grounds and because the Alliance's proposed interpretation of the statutes conflicts with their text, structure, and/or history. The court will address each of the defendants' contentions in turn.

## DISCUSSION

### I. *Standard of Review*

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." While " 'detailed factual allegations' " are not required, the plaintiff must present "more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This "plausibility standard" requires a showing of "more than a sheer possibility" that the defendant is liable on the claim. *Id.* The allegations of the complaint must set forth enough facts "to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955. In other words, the complaint must contain sufficient factual matter, accepted as true, to permit a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663, 129 S.Ct. 1937. As noted *supra,* when considering a

motion to dismiss, "the court limits its consideration to the pleadings and exhibits attached thereto" and incorporated into the complaint by reference; *see Thaeter v. Palm Beach County Sheriff's Office,* 449 F.3d 1342, 1352 n. 7 (11th Cir.2006) (internal marks omitted); the court also accepts all factual allegations of the complaint as true and construes them in the light most favorable to the plaintiff, *see Pielage v. McConnell,* 516 F.3d 1282, 1284 (11th Cir. 2008). However, the court need not credit "[t]hreadbare recitals" of the legal elements of a claim unsupported by plausible factual allegations because "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937.

## II. *The Alliance's Claims*

### A. Count I—Parts and Labor Reimbursement Provisions

As discussed above, Fla. Stat. § 320.696(3) and (4) sets forth certain rates at which licensees must compensate motor vehicle dealers for parts and labor used in authorized repairs in the event the parties are unable to reach an agreement as to reimbursement rates. The Alliance alleges that the statutory rates are "at or above the highest possible levels that a personal-use, retail consumer might pay, rather than at the parties' preexisting contract rights, which take[ ] into account the volume, predictability, and other benefits of such work," and that the statutes violate the Florida Due Process Clause by interfering with Members' fundamental right to negotiate reimbursement rates while bearing no rational relation to the public health, safety, or general welfare. According to the Alliance, by tying reimbursement rates to the amount retail customers

pay for selected repairs, and because dealers derive a significant source of revenue from covered repairs and services, the Parts and Labor Reimbursement Provisions encourage Florida dealers to raise their retail prices and rates to the detriment of Florida consumers.[11] The Alliance also alleges that the Parts and Labor Reimbursement Provisions violate the Contract Clauses of the United States and Florida Constitutions because they substantially impair Members' contracts with Florida dealers by prohibiting Members from exercising their contractual right to negotiate reimbursement rates and are neither reasonable nor necessary to serve an important public purpose.

### 1. Due Process Challenge

▓▓▓ Under the Florida Constitution, "[n]o person shall be deprived of life, liberty, or property without due process of law." Fla. Const. Art. I, § 9. However, "[t]he state has the police power to enact laws reasonably construed as expedient for protections of the public health, safety, welfare, or morals," which power "embraces regulations designed to promote the public convenience or the general prosperity or the public welfare as well as those designed to promote the public safety or public health." *Brevard Cnty. v. Stack,* 932 So.2d 1258, 1261 (Fla. 5th DCA 2006). In other words, "[t]he due process clause does not override the power of the state or its political subdivisions to establish laws that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community." *Id.* at 1262; *see Palm Beach Mobile Homes, Inc. v. Strong,* 300 So.2d 881, 884–85 (Fla.1974) (noting that the state has broad police powers and may "regulate any enterprise, trade, occupation or pro-

---

**11.** The Alliance acknowledges, however, that at least some of the dealers that have raised retail prices in an effort to obtain higher

statutory reimbursement rates have offered promotional discounts to retail customers in order to offset the additional expense.

fession if necessary to protect the public health, welfare, or morals"). A statute will be upheld under Florida's substantive Due Process Clause if it "bears a rational relation to a legitimate legislative purpose in safeguarding the public health, safety, or general welfare and is not discriminatory, arbitrary, or oppressive." *Haire v. Fl. Dept. of Agric. and Consumer Servs.*, 870 So.2d 774, 782 (Fla.2004) (internal marks omitted). "In applying this standard of review, a court must remain cognizant of the legislature's broad range of discretion in its choice of means and methods by which it will enhance the public good and welfare." *Id.* (internal marks omitted). Indeed, "[a]ll legislation is endowed with a strong presumption of validity, and a court may not substitute its judgment, for that of the legislature, as to the wisdom and policy of a particular statute." *Sixty Enters., Inc. v. Roman & Ciro, Inc.*, 601 So.2d 234, 236 (Fla. 3d DCA 1992). "[T]he narrow question before th[e] court is simply whether the Act is rationally or reasonably related to furthering a legitimate State objective." *Id.*

■ The purpose of the Parts and Labor Reimbursement Provisions is "to protect the public health, safety, and welfare of the citizens of the state by regulating the licensing of motor vehicle dealers and manufacturers, maintaining competition, providing consumer protection and fair trade and providing minorities with opportunities for full participation as motor vehicle dealers." Fla. Stat. § 320.605. The Alliance does not dispute that the State of Florida has a legitimate interest in regulating the motor vehicle industry. The Alliance insists, however, that the Parts and Labor Reimbursement Provisions do not promote the interests of Florida consumers. Specifically, in its complaint, the Alliance alleges that the Parts and Labor Reimbursement Provisions "bear no rational relation to the public health, safety, or general welfare, and are likely to hurt consumers in Florida and throughout the United States" by encouraging dealers to raise their retail prices for non-warranty repair work. The defendants disagree, arguing that the rationality of the relationship between the Parts and Labor Reimbursement Provisions and the public interest is undeniable.

Although the court remains mindful of its limited role in assessing the validity of legislation, it finds, when viewing the facts in the light most favorable to the Alliance, that in challenging the rationality of the relationship between the Parts and Labor Reimbursement Provisions and the public welfare, the Alliance has sufficiently pled a due process claim. *See Chicago Title Ins. Co. v. Butler*, 770 So.2d 1210, 1219 (Fla. 2000) (finding statutes that prohibited title insurance agents from rebating a portion of their risk premium unconstitutional because they did "not achieve the Legislature's avowed purposes and instead simply deprive[d] the consuming public of a choice in the price of products or services, the choice of which is the cornerstone of a competitive, free-market economy"); *Dep't of Ins. v. Dade Cnty. Consumer Advocate's Office*, 492 So.2d 1032, 1034 (Fla.1986) (holding that a court may overturn a statute on due process grounds "when it is clear that it is not in any way designed to promote the people's health, safety or welfare, or that the statute has no reasonable relationship to the statute's avowed purpose"); *Liquor Store v. Continental Distilling Corp.*, 40 So.2d 371, 374 (Fla.1949) (holding that "[i]f the vantage sought is personal as distinguished from the *general public* then the police power may not be invoked" and that "constitutional law never sanctions the granting of sovereign power to one group of citizens to be exercised against another unless the *general welfare* is served"); *see also Eskind v. City of Vero Beach*, 159 So.2d 209, 212 (Fla.1963). While it may be true that the Florida

Supreme Court has not yet recognized a fundamental right to negotiate in the specific context of this case, as the defendants assert, it has recognized the right to contract and to pursue a lawful business as valuable property rights that may be reasonably restrained only in the interest of the public welfare. *See Strong*, 300 So.2d at 884) ("Freedom to contract and a citizen's right to pursue a lawful business which are valuable property rights are subject to reasonable restraint in the interest of the public welfare. The right to contract is the general rule and restraint of this right by the police power is the exception to be exercised when necessary to secure the comfort, health, welfare, safety and prosperity of the people.") (internal marks omitted). Moreover, the court has held that "[n]either a state nor a city can arbitrarily interfere in private businesses or impose unreasonable and unnecessary restrictions upon them, under the guise of protecting the public" and that, "[w]hen there is no reasonably identifiable rational relationship between the demands of the public welfare and the restraint upon private business, the latter will not be permitted to stand." *Eskind*, 159 So.2d at 212. Based on the allegations in the complaint, the court finds that the defendants' motion to dismiss the Alliance's due process challenge to the Parts and Labor Reimbursement Provisions should be denied.[12]

### 2. Contract Clause Challenge

■■■ Both the United States and Florida Constitutions prohibit laws that impair the obligations of existing contracts. *See* U.S. Const. Art. 1, § 10; Fla. Const. Art. I, § 10. As the Eleventh Circuit has observed with regard to the federal Contract Clause, " '[a]lthough the language of the Contract Clause is facially absolute, its prohibition must be accommodated to the inherent police power of the State to safeguard the vital interests of its people.' " *Vesta Fire Ins. Corp. v. State of Fla.*, 141 F.3d 1427, 1433 (11th Cir.1998) (quoting *Energy Reserves Group, Inc. v. Kan. Power and Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983) (internal citation omitted)). "Three factors are considered when evaluating a claim that the [federal] Contract Clause has been violated: (1) whether the law substantially impairs a contractual relationship; (2) whether there is a significant and legitimate public purpose for the law; and (3) whether the adjustments of rights and responsibilities of the contracting parties are based upon reasonable conditions and are of an appropriate nature." *Id.* To determine the degree of impairment permissible under Florida's Contract Clause, courts "must weigh the degree to which a party's contract rights are statutorily impaired against both the source of authority under which the state purports to alter the contractual relationship and the evil which it seeks to remedy." *Pomponio v. Claridge of Pompano Condo., Inc.*, 378 So.2d 774, 780 (Fla.1979)); *see also Cohn v. Grand Condo. Ass'n, Inc.*, 26 So.3d 8, 10 (Fla. 3d DCA 2009). "Obviously, this becomes a balancing process to determine whether the nature and extent of the impairment is constitutionally tolerable in light of the importance of the state's objective, or whether it unreasonably intrudes into the parties' bargain to a degree greater than necessary to achieve that objective." *Pomponio*, 378 So.2d at 780. Courts consider several factors when determining the severity of impairment under Florida's Contract Clause, including (1) whether the law was enacted to address a broad, generalized economic or social problem; (2)

---

**12.** To be clear, the court is not making any finding at this stage of the proceedings regarding whether the statute in fact was de- signed to promote the public's interest or achieves its goal in that regard.

whether the law operates in an area which was already subject to state regulation at the time the parties' contractual obligations were originally undertaken or an area not previously subject to state regulation; [13] and (3) whether the law temporarily or permanently alters contractual relationships and the extent of the impairment. *Cohn*, 26 So.3d at 10. Although some degree of impairment is permissible under the federal Contract Clause, the Florida Contract Clause has been interpreted as allowing little to no impairment. *See Coral Lakes Commun. Ass'n v. Busey Bank, N.A.*, 30 So.3d 579, 584 (Fla. 2d DCA 2010) ("In this state, it is a 'well-accepted principle that virtually no degree of contract impairment is tolerable.'") (quoting *Pomponio*, 378 So.2d at 780).

■■■ The defendants argue that the Alliance has failed to state a viable Contract Clause claim because it has not identified any specific contract or contractual provision that is impaired and also because the Alliance lacks standing to assert such a claim. The court is not persuaded. Contrary to the defendants' assertions, the Alliance has identified the contractual provisions it contends are impaired by the Parts and Labor Reimbursement Provisions—*i.e.*, the provisions in the Members' Dealer Agreements that allow for negotiation of reimbursement rates. The defen-

dants' first argument thus is unavailing. Regarding the defendants' second argument on standing, it is well-settled that an association may have standing in its own right to seek judicial relief from injury to itself, and "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." [14] *Warth*, 422 U.S. at 511, 95 S.Ct. 2197. In order to demonstrate representational associational standing, an association must establish (1) that its members would otherwise have standing to sue in their own right; (2) that the interests the association seeks to protect are germane to its purpose; and (3) that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343, 97 S.Ct. 2434; *see also Warth*, 422 U.S. at 511, 95 S.Ct. 2197. The defendants do not dispute that the Members would have standing to maintain this action in their own right or that the interests the Alliance seeks to protect are germane to its purpose; rather, the defendants argue that the Alliance's Contract Clause challenges require particularized proof and the participation of the Alliance's Members to establish that a specific contractual provision has been impaired and the substantiality of that impairment. In particular, the defendants argue that foreseeability of

---

**13.** Courts construing the federal Contract Clause also consider the extent of existing regulation. *See, e.g., Exxon Corp. v. Eagerton*, 462 U.S. 176, 194 n. 14, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983); *Energy Reserves Group, Inc.*, 459 U.S. at 416, 103 S.Ct. 697 (1983).

**14.** "The modern doctrine of associational standing, under which an organization may sue to redress its members' injuries, even without a showing of injury to the association itself, emerges from a trilogy of cases," *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 552, 116 S.Ct. 1529, 134 L.Ed.2d 758 (1996), beginning with *Warth v. Seldin*, 422 U.S. 490,

511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), which squarely recognized an organization's right to bring suit on behalf of its members depending on the nature of the claim and relief sought. The doctrine was refined into a clearly delineated thee-part test in *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), and the Court reaffirmed those principles and permitted an association to challenge a pure question of law without the participation of its members in *Int'l Union, United Auto., Aerospace and Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 287–90, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986).

the challenged regulations is an essential element of the Alliance's Contract Clause claims and that such a determination requires individualized proof regarding the various Dealer Agreements. The defendants also argue that, in determining whether the Dealer Agreements are substantially impaired by the Parts and Labor Reimbursement Provisions, the court must consider reimbursement rates before and after enactment of the statute, the reasons for any changes, and the methods used by the Members in determining reimbursement rates.[15]

Notably, the third prong of the associational standing test—the only prong at issue in this case—is a prudential, rather than constitutional, requirement and typically does not need to be met when an association seeks only declaratory relief on behalf of its members. *See, e.g., Conn. State Dental Ass'n v. Anthem Health Plans, Inc.,* 591 F.3d 1337, 1354 (11th Cir. 2009) (noting that declaratory relief is "normally appropriate relief for associational standing"); *Wein v. Am. Huts, Inc.,* 313 F.Supp.2d 1356, 1360 (S.D.Fla.2004); *Lake Lucerne Civic Ass'n, Inc. v. Dolphin Stadium Corp.,* 801 F.Supp. 684, 690 (S.D.Fla.1992) ("Courts applying the third prong of the *Hunt* test have generally allowed associations standing to seek declaratory or injunctive relief."). Indeed, "[t]he determination of 'whether an association has standing to invoke the court's remedial powers on behalf of its members

depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks [a] declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.'" *Wein,* 313 F.Supp.2d at 1360 (quoting *Warth,* 422 U.S. at 515, 95 S.Ct. 2197). In this case, the Alliance seeks only declaratory relief with regard to its Contract Clause claim asserted in Count I. Although that fact alone may provide a sufficient basis upon which to reject the defendants' standing challenge, *see id.* at 1360–61, the court notes further, with regard to the nature of the claim asserted, that the Alliance alleges that its Members' contracts have been impaired in the same manner by the Parts and Labor Reimbursement Provisions—specifically, that the Members are precluded from exercising their right to negotiate reimbursement rates—and that there is no need for each Member to separately establish impairment of its Dealer Agreements.[16] The Alliance also argues that while foreseeability of the statute may be a consideration in determining the degree of impairment, such a determination likewise can be made without extensive participation by the Members. The court agrees.

As the Alliance points out, the issue is whether the Parts and Labor Reimbursement Provisions were foreseeable to the

---

**15.** The defendants do not argue that participation of the individual Members will be necessary in order for the Alliance to demonstrate changes in the levels of reimbursement as a result of the statute; instead, they argue only that such an analysis will be "difficult to conduct" without the Members' participation. The fact that the analysis may be difficult, a point the court does not concede, does not mean that the participation of the individual Members is required.

**16.** In *Alliance of Auto. Mfrs. v. Gwadosky,* 430 F.3d 30, 33 n. 1 (1st Cir.2005), the First Circuit Court of Appeals noted that "General Motors' standard franchise agreement [was] representative of the genre." The court made a similar observation in *Volkswagen Interamericana, S.A. v. Rohlsen,* 360 F.2d 437, 440 n. 2 (1st Cir.1966) ("We note that the standardization of franchises is common not only within the operations of a particular manufacturer or distributor, but in the automobile industry as a whole.").

Members at the time they entered into their Dealer Agreements. Such a determination depends on the extent to which the industry has been regulated in the past. *See Cohn,* 26 So.3d at 11; *see also Pomponio,* 378 So.2d at 779. Here, the Alliance has alleged that, "except in limited circumstances, the Dealer Agreements currently in effect between Members and Florida dealers predate the effective date of the 2008 and 2009 Amendments," and both parties recognize that the law remained largely unchanged for decades prior to the enactment of the 2008 and 2009 Amendments.[17] With that understanding, the court is unable to see how the individual Members' participation will be required.[18] At this time, considering the nature of the relief sought and the claim itself, the court finds that the Alliance has pled sufficient facts to demonstrate its standing to pursue the Contract Clause claim alleged in Count I of its complaint. *See, e.g., Borrero v. United Healthcare of N.Y., Inc.,* 610 F.3d 1296, 1306 (11th Cir. 2010) (finding that associations, which sought only declaratory and injunctive relief, had standing to sue on behalf of their members because their claims could be litigated with limited participation of their members); *see also Washington Health Care Ass'n v. Arnold–Williams,* 601 F.Supp.2d 1224, 1232 (W.D.Wash.2009).[19]

## B. Count II—Recoupment Bar

According to Fla. Stat. § 320.696(6), "[a] licensee shall not recover or attempt to recover, directly or indirectly, any of its costs for compensating a motor vehicle dealer under this section."[20] The Alliance argues that the Recoupment Bar discriminates against out-of-state manufacturers, dealers, and consumers, both on its face and in its effects, by requiring them to bear higher costs in favor of in-state dealers in violation of the Commerce Clause of the United States Constitution. According to the Alliance, if the Recoupment Bar is interpreted and applied as written, Members will be prohibited from recovering the increased costs of doing business in Florida from dealers in Florida and elsewhere. Even if the statute is interpreted as barring recoupment only from Florida dealers, the Alliance insists that it nevertheless is unconstitutional because it imposes substantial additional costs on Members doing

**17.** According to the defendants, the Florida legislature first addressed warranty reimbursement in 1970, requiring manufacturers to "reasonabl[y] compensate any authorized motor vehicle dealer who performs work to rectify the [manufacturer's] product or warranty defects." The law remained unchanged for nearly four decades. The legislature revised the warranty reimbursement provisions in 2007, requiring that manufacturers reimburse dealers for parts at retail prices. Nonetheless, even if the 2007 revisions rendered the 2008 and 2009 amendments foreseeable, there is no indication in the record that any of the Dealer Agreements were entered into after the 2007 revisions.

**18.** As the Eleventh Circuit has noted, "should the actual litigation of the ... associations' claims involve excessive individual participation, the ... court retains discretion to consider the associations' standing at that la-

ter time. But, at the pleadings stage, ... dismissal is premature." *Borrero,* 610 F.3d at 1306 n. 3.

**19.** The defendants cite *Ga. Cemetery Ass'n., Inc. v. Cox,* 353 F.3d 1319 (11th Cir.2003), in support of their argument that the Alliance lacks standing to assert a Contract Clause claim on behalf of its Members. Although the court held in *Ga. Cemetery* that the participation of the association's members was required, that case is distinguishable from the one at bar because it involved a Takings claim as to which the precise economic impact on each member had to be ascertained. In this case, no such inquiry is required.

**20.** Although the prior version of the statute identified specific recoupment practices that were prohibited, the current version omits all such references.

business in Florida, which harms consumers in Florida and other states by directly impacting the terms on which Members and dealers offer vehicles for sale outside the state of Florida.[21] The Alliance also contends that the Recoupment Bar violates the Contract Clauses of the United States and Florida Constitutions because it substantially impairs the parties' rights and obligations under the Dealer Agreements by preventing Members from seeking to recover the costs of warranty and other covered repair and maintenance work despite the fact that they have reserved the right in their Dealer Agreements to set wholesale prices for motor vehicles and related products.[22]

### 1. Commerce Clause Challenge

■ The United States Constitution bestows upon Congress the power "[t]o regulate Commerce . . . among the several States. . . ." U.S. Const., Art. I, § 8, cl. 3. "Although the Constitution does not in terms limit the power of States to regulate commerce, [the Supreme Court has] long interpreted the Commerce Clause as an implicit restraint on state authority, even in the absence of a conflicting federal statute." *United Haulers Ass'n, Inc. v. Oneida–Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007); *see Bainbridge v. Turner*, 311 F.3d 1104, 1108 (11th Cir. 2002) ("Although the clause speaks literally only to the powers of Congress, it is well settled that it has a 'dormant' aspect as well, namely, one that serves as 'a substan-

tive restriction on permissible state regulation of interstate commerce.' "). " 'This "negative" aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.' " *Bainbridge*, 311 F.3d at 1108 (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)). "To determine whether a statutory scheme violates the dormant Commerce Clause, [courts] employ two tiers of analysis." *Id.* "If the scheme 'directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, [courts] have generally struck down the statute without further inquiry.' " *Id.* at 1109. "Only if such a regulation is shown to 'advance[ ] a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives' will it be upheld." *Id.* (quoting *Limbach*, 486 U.S. at 278, 108 S.Ct. 1803). " 'When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, [courts] have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.' " *Id.* (quoting *Brown–Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). "Though the two tiers of analysis are not clearly distinguishable, '[i]n either situation, the critical consideration is the

**21.** According to the complaint, "Members facing increased parts and labor reimbursement costs in a particular state often exercise or consider exercising their contractual right to increase their wholesale prices or otherwise recover such higher costs" in that state. Because the Recoupment Bar prohibits them from doing so in the state of Florida, Members must recover the increased costs of doing business in Florida from dealers and consumers in other states. The Alliance estimates that

its Members will increase costs to out-of-state consumers, dealers, and manufacturers by tens of millions of dollars to compensate for the additional costs they will be forced to incur in order to sell vehicles in Florida.

**22.** As the First Circuit also noted in *Gwadosky*, "[i]n the usual motor vehicle franchise agreement, the manufacturer reserves the right to set wholesale vehicle prices unilaterally." 430 F.3d at 33.

overall effect of the statute on both local and interstate activity.'" *Id.* (quoting *Brown–Forman,* 476 U.S. at 579, 106 S.Ct. 2080).

 The defendants argue that the Recoupment Bar is not facially discriminatory because it applies equally to all manufacturers, regardless of residency.[23] As the defendants point out, in the most recent amendments to the statute, the Florida legislature removed language referring to prices in effect "nationally" and "regionally" to dispel any notion that it sought to regulate conduct outside the state of Florida. Based on the current language of the statute, the court agrees that the Recoupment Bar is not facially discriminatory and that the Alliance has failed to state a plausible claim in that regard. Regarding the Alliance's "as applied" challenge to the Recoupment Bar, however, the court does not agree with the defendants' position that the Alliance has failed to state a claim upon which relief can be granted. The defendants argue that this claim is not ripe for review because the effects of the statute are unknown at this point because the Members have not yet imposed surcharges in an effort to recover additional costs imposed by the Parts and Labor Reimbursement Provisions.

 The ripeness doctrine involves both jurisdictional and prudential concerns. *Digital Props., Inc. v. City of Plantation,* 121 F.3d 586, 589 (11th Cir. 1997). "Article III of the United States Constitution limits the jurisdiction of the federal courts to cases and controversies of sufficient concreteness to evidence a ripeness for review." *Id.* (citing U.S. Const. art. III, § 2, cl. 1). "Even when the constitutional minimum has been met, ... prudential considerations may still counsel judicial restraint." *Id.* (internal marks

omitted). "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." *Id.* In other words, "[t]he doctrine seeks to avoid entangling courts in the hazards of premature adjudication." *Id.* (internal marks omitted). In considering ripeness, courts must decide whether the issues in a particular case are suitable for judicial decision and whether a failure to adjudicate the matter will impose a hardship on the parties. *Id.* In so doing, courts consider whether there is "sufficient injury to meet Article III's requirement of a case or controversy and, if so, whether the claim is sufficiently mature, and the issues sufficiently defined and concrete, to permit effective decisionmaking by the court." *Id.* (internal marks omitted). Where there is threatened action by the government, a party need not "expose himself to liability before bringing suit to challenge the basis for the threat—for example, the constitutionality of a law threatened to be enforced." *MedImmune, Inc. v. Genentech, Inc.,* 549 U.S. 118, 128–29, 127 S.Ct. 764, 166 L.Ed.2d 604 (2007). "The plaintiff's own action (or inaction) in failing to violate the law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction ... because the threat-eliminating behavior was effectively coerced." *Id.* at 129, 127 S.Ct. 764. "The dilemma posed by that coercion—putting the challenger to the choice between abandoning his rights or risking prosecution—is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate." *Id.* (internal marks omitted). "Injunctive and declaratory relief is available so long as the plaintiffs demonstrate a 'genuine threat of imminent prosecution.'" *Am. Booksellers Ass'n,*

---

**23.** The defendants also note that the Alliance has not alleged that the provision discriminates in favor of in-state manufacturers, which apparently do not exist.

*Inc. v. McAuliffe,* 533 F.Supp. 50, 54–55 (D.C.Ga.1981) (quoting *High Ol' Times, Inc. v. Busbee,* 621 F.2d 135, 139 (5th Cir.1980)). "The fact that the statute in question has not been applied to plaintiffs does not defeat the existence of a controversy, and an anticipatory attack is appropriate where 'the allegedly unconstitutional statute interferes with the way the plaintiff would normally conduct his affairs.'" *Id.* (quoting *Int'l Soc. for Krishna Consciousness v. Eaves,* 601 F.2d 809, 819 (5th Cir. 1979)).

 Applying these principles in this case, the court has little difficulty finding that the Alliance's Commerce Clause challenge to the Recoupment Bar is ripe. Not only does the statute prohibit licensees from recouping costs imposed by the Parts and Labor Reimbursement Provisions, but it also provides for civil and criminal penalties in the event of a violation.[24] The Alliance also has alleged that its Members have changed the manner in which they do business in order to avoid the potential penalties for a violation of the statute. As set forth above, the Alliance claims that, as a result of the Recoupment Bar, its Members have refrained from their ordinary practice of recovering increased costs of doing business in a particular state by increasing the wholesale price of vehicles in that state or otherwise instituting measures to recover the additional costs.[25] The court thus finds that the Alliance has alleged a sufficient injury to meet Article III's case or controversy requirement. *See, e.g., Pennell v. City of San Jose,* 485 U.S. 1, 7–8, 108 S.Ct. 849, 99

L.Ed.2d 1 (1988) (holding that the likelihood of enforcement of a rent control ordinance, "with the concomitant probability that a landlord's rent [would] be reduced below what he or she would otherwise be able to obtain in the absence of the Ordinance, is a sufficient threat of actual injury to satisfy Art. III's requirement that [a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement") (internal marks omitted). The court also considers the issue well enough defined for it to render an effective decision and that the matter is well-suited for judicial resolution. Finally, the court finds that hardship would result in the event it declined to exercise jurisdiction at this time. This matter has been pending for more than three and a half years and the Alliance has alleged that, as of the time it filed its amended complaint, the Parts and Labor Reimbursement Provisions had "already generated an onslaught of requests from Florida dealers for additional reimbursement, causing Members to incur substantially higher costs of doing business in Florida." The defendants' motion to dismiss the Alliance's Commerce Clause claim set forth in Count II thus is denied.

### 2. Contract Clause Challenge

 In addition to its Commerce Clause claim, the Alliance alleges in Count II of its complaint that the Recoupment Bar violates the Contract Clauses of the United States and Florida Constitutions by prohibiting Members from exercising

---

**24.** Pursuant to Fla. Stat. § 320.70, a violation of the statutes constitutes a misdemeanor of the first degree, punishable by up to one year imprisonment. The DHSMV may also impose civil fines against the Members for certain violations of the Act. *See* Fla. Stat. § 320.698. And Fla. Stat. § 320.697 authorizes a dealer to bring a private cause of action against any manufacturer, importer, or dis-

tributor that violates the Act and provides for mandatory recovery by a prevailing dealer of treble damages, costs, and attorneys' fees.

**25.** The defendants acknowledge that the Alliance's Members have not engaged in any activity that could subject them to liability under the statute.

their contractual rights to set wholesale prices for motor vehicles and related products in a manner that will allow them to recover the higher costs imposed by the Parts and Labor Reimbursement Provisions. The defendants urge the court to dismiss the Alliance's Contract Clause challenges to the Recoupment Bar on the same grounds they seek dismissal of the Alliance's Contract Clause challenges to the Parts and Labor Reimbursement Provisions—the lack of specific contracts and the need for Members' participation. The court rejects this challenge for the same reasons it rejected the challenge to the Contract Clause claim asserted in Count I. Again, contrary to the defendants' assertions, the Alliance has identified contractual provisions it contends are impaired by the Recoupment Bar—provisions in the Members' Dealer Agreements that allow Members to set wholesale prices for motor vehicles. Moreover, considering that the Alliance is seeking only declaratory relief and has alleged that the Members' Dealer Agreements contain a standard provision allowing the Members to set the wholesale price for vehicles and that the Recoupment Bar precludes enforcement of that provision in a manner that impacts all Members in the same manner, the court finds that extensive participation of the Members will not be required and that the Alliance has pled sufficient facts to demonstrate its standing to bring the Contract Clause claim asserted in Count III.

### C. Count III—Extraterritorial Benefit Restriction

The Extraterritorial Benefit Restriction prohibits licensees from offering incentive programs in areas outside of Florida when they do not offer the same program in Florida unless the licensee demonstrates that the exclusion of the program from Florida is "reasonably supported by substantially different economic or marketing considerations than are applicable to the licensee's same line-make dealers in this state." Fla. Stat. § 320.64(38). According to the Alliance, Members offer bonus, incentive, and other benefit programs to dealers for a variety of reasons, including to stimulate vehicle sales and interbrand competition and address local market conditions. Members issue program-specific guidelines and rules setting forth the eligibility requirements and criteria that dealers must meet in order to qualify for benefits under a program. The decision to offer bonus and incentive programs is based on a variety of factors, including prevailing market conditions, the costs associated with offering the programs, and the costs of doing business in a particular state. The Alliance avers that, because of the Extraterritorial Benefit Restriction, Members may be required to alter the manner in which they research, document, and resolve all of their decisions about benefit programs offered in interstate commerce in the event they ultimately decide not to offer a program in Florida. According to the Alliance, the provision may also require Members who decide not to offer national and regional benefit programs in Florida to share with Florida authorities and dealers sensitive and confidential economic and business-related data that informs their business judgments, including data related entirely to out-of-state dealers and markets. The Alliance suggests, moreover, that even if a Member believes in good faith that its decision to offer a benefit program nationally or in the same region as Florida but not within the state is reasonably supported by substantially different economic or marketing considerations, the Member will be reluctant to exercise its legitimate business judgment to exclude Florida because of the threat of criminal sanctions and mandatory treble damages if it is mistaken. In short, the Alliance maintains that the Extraterritorial Benefit Restriction "directly impacts

the terms by which Members and dealers offer vehicles for sale outside of Florida" and is unconstitutional on its face.

■ The defendants argue that the Alliance's facial attack on the Extraterritorial Benefit Restriction fails because the statute can be constitutionally applied in certain instances due to the exception for differing economic or marketing conditions, rendering the statute valid under *Salerno*.[26] As an example of a manner in which the statute can be constitutionally applied, the defendants describe a scenario in which a hurricane strikes another state in the same region as Florida. According to the defendants, a licensee could offer a special pricing promotion in the affected state without offering the same promotion to Florida dealers and not violate the Extraterritorial Benefit Restriction.[27] Even if the statute can be constitutionally applied in certain circumstances, the Alliance is not required to negate all such applications at this stage of the proceedings. The Alliance is required only to state a plausible claim that the statute is facially unconstitutional, which it has done. Whether the Alliance will be able to substantiate that claim by demonstrating the absence of any constitutional application will be decided at the summary judgment stage. The court thus rejects the defendants' position that the Alliance has failed to state a claim in Count III because it cannot satisfy *Salerno*.

■ As with the Recoupment Bar, the defendants also argue that the Alliance's Commerce Clause challenge to the Extraterritorial Benefit Restriction is not ripe because the Alliance has failed to allege the existence of any specific benefit program that might be affected by the statute, much less the details of the program or the justification for not offering it in the state of Florida. According to the defendants, Count III lacks sufficient factual detail to support a decision by this court. In the defendants' view, the court cannot resolve this claim without reviewing an actual benefit program affected by the statute and assessing individual harm suffered by a Member. For the same reasons the court gave in rejecting the defendants' ripeness challenge to Count II, the court disagrees. Again, all that is required at this stage of the proceedings is

---

**26.** In *Salerno*, the Supreme Court held that, to prevail on a facial challenge to a statute, a plaintiff "must establish that no set of circumstances exists under which the [law] would be valid." 481 U.S. at 745, 107 S.Ct. 2095. Although the validity of *Salerno* is somewhat dubious, *see, e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 n. 22, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999) (noting that *Salerno* does not set the standard for facial challenges and that the appropriateness of its application is "doubtful"), the Eleventh Circuit, whose instruction this court is bound to follow, has applied its holding to a wide array of constitutional challenges and recently reiterated its intent to continue to "faithfully apply" the holding of the case as long as it remains binding precedent. *See Georgiacarry.org., Inc. v. Ga.*, 687 F.3d 1244, 1255 n. 19 (11th Cir. 2012) ("While *Salerno* is often criticized, its holding remains binding precedent, which we faithfully apply here."); *see also United States*

*v. Ballinger*, 395 F.3d 1218, 1224–25 (11th Cir.2005) (applying *Salerno* to constitutional challenge to criminal conviction); *Williams v. Pryor*, 240 F.3d 944, 953 (11th Cir.2001) (applying *Salerno* to facial challenge to statute prohibiting the distribution of sexual devices); *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1036 (11th Cir.2001) (applying *Salerno* to inmate's facial challenge to sheriff's policy regarding the release of sick and injured inmates); *Gulf Power Co. v. U.S.*, 187 F.3d 1324, 1328 (11th Cir.1999) (applying *Salerno* to facial challenge to law requiring utilities to allow cable companies and telecommunications carriers access to their poles, ducts, conduits, and rights-of-way).

**27.** The Alliance argues that the scenario described by the defendants fits within the exception to the statute and thus does not trigger the statute's application.

that the Alliance allege sufficient facts to state a plausible claim for relief. It plainly has done that by alleging that the Extraterritorial Benefit Restriction impermissibly burdens Members that offer benefit programs outside the state of Florida by forcing them to justify their out-of-state decisions to Florida authorities; imposes certain requirements on Members, such as maintaining records of their decisionmaking and revealing their internal deliberations to Florida authorities to justify their out-of-state business decisions; and subjects Members to serious sanctions in the event the State of Florida concludes that their decisions were not justified under the statute. Perhaps most significantly, the Alliance alleges that the Extraterritorial Benefit Restriction "directly impacts the terms by which Members and dealers offer vehicles for sale outside of Florida." The court finds these allegations sufficient to state a claim for a Commerce Clause violation. *See Healy v. Beer Institute, Inc.*, 491 U.S. 324, 337–39, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989) (noting that the Commerce Clause "dictates that no State may force an out-of-state merchant to seek regulatory approval in one State before undertaking a transaction in another" or "forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the [local] market regardless of local competitive conditions").

## D. Counts IV and V—Interpretation of the Recoupment Bar and Extraterritorial Benefit Restriction

Finally, in Count IV of its complaint, the Alliance seeks a declaratory judgment that its Members may refuse to offer or reduce bonus, incentive, or other benefit programs in the state of Florida as a way to offset the economic burden imposed by the Parts and Labor Reimbursement Provisions without violating the Recoupment Bar. In Count V, the Alliance seeks a declaratory judgment that, to the extent such a reduction or elimination of a bonus, incentive, or other benefit program offered in Florida in response to the economic burden imposed by the Parts and Labor Reimbursement Provisions is deemed inconsistent with the Recoupment Bar, the Extraterritorial Benefit Restriction permits such action provided that the Members demonstrate that their higher parts and labor reimbursement costs in Florida are substantially different than those in other states. The defendants argue neither claim is ripe because the Alliance has not alleged concrete facts to support either one and the Alliance's interpretations of the statutes are inconsistent with the language, structure, and purpose of the laws. The court rejects the defendants' ripeness challenges for the reasons previously stated. The court also finds that, in order to interpret the statutes, it will need to consider them in the context in which they were enacted, including their history and purpose, as well as their practical impact. The court thus denies the defendants' motion to dismiss Counts IV and V and will entertain a motion for summary judgment as to both counts at the appropriate time.

## CONCLUSION

For the reasons set forth above, the defendants' motion to dismiss (doc. 46) is **GRANTED** with respect to the Alliance's facial challenge to the Recoupment Bar and **DENIED** in all other respects. The stay that was entered in this matter is hereby lifted and the parties shall proceed with discovery. A Rule 16 status conference will be scheduled by separate order.